36 P.3d 749

**Susan S. DANIELSON (fka Evans), Petitioner/Appellee,**

v.

**Donald W. EVANS, Respondent/Appellant.**

No. 2 CA–CV 00–0184.

Court of Appeals of Arizona, Division 2, Department A.

Dec. 18, 2001.

Karp, Heurlin & Weiss, P.C., By Leonard Karp and Laura C. Belleau, Tucson, for Petitioner/Appellee.

Law Office of Ethan Steele, By Ethan Steele, Tucson, for Respondent/Appellant.

Karalekas & Noone, By James A. Noone, Washington, D.C., for Amicus Curiae American Retirees Association.

Law Office of Marshal S. Willick, By Marshal S. Willick, Las Vegas, NV, for Amicus Curiae, Ex–Pose.

## OPINION

PELANDER, J.

¶ 1 This post-dissolution, domestic relations case concerns division of military retirement benefits and again presents thorny issues that arise when state law community property principles allegedly clash with the Uniformed Services Former Spouses' Protection Act (the Act), 10 U.S.C. § 1408. *See Mansell v. Mansell,* 490 U.S. 581, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989); *Harris v. Harris,* 195 Ariz. 559, 991 P.2d 262 (App.1999); *In re Marriage of Gaddis,* 191 Ariz. 467, 957 P.2d 1010 (App.1997), *cert. denied,* 525 U.S. 826, 119 S.Ct. 73, 142 L.Ed.2d 57 (1998). Appellant Donald Evans appeals from two trial court orders—the first requires him to compensate his former spouse, appellee Susan Danielson (fka Evans), for the difference between the projected value of her interest in his future military retired pay, as prescribed in the dissolution decree, and the reduced amount of that pay she actually received after Evans later waived much of it in order to receive veterans' disability benefits; and the second order holds him in contempt for failing to comply with the first. We affirm the first order but partially vacate the second.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 The pertinent facts and procedural background in this matter are essentially undisputed. The parties were married from 1978 to 1993, when the marriage was dissolved pursuant to a Colorado decree. At the time of their marriage, both parties were employed as military officers in the United States Army. Based on their mutual decision, however, Danielson subsequently resigned her commission and became a military spouse, principal homemaker, and stay-at-home parent to the parties' three children. When the marriage was dissolved in 1993, Evans was on active duty and contemplating retirement.

¶ 3 The parties' dissolution proceedings in Colorado included five days of hearings before a special master, who issued extensive findings of fact and conclusions of law. The master found that because Evans's future military retirement could not be "accurately and actuari[al]ly determined" at that time due to unknown factors and "unresolvable contingencies,"

> the most prudent way to share in this marital asset is to divide the same in accordance with a "coverture formula", wherein the numerator of the formula is the number of months in this marriage, i.e., 179 months divided by an anticipated military career of 240 months. This results in wife having a 37.3[%] interest into [sic] husband's future military benefits. Wife is given a 50% portion of the "coverture formula" as her sole and separate property.

The master further directed that "Husband shall assist wife in procuring and receiving 37.3% of his disposable pay, as defined by federal law, and wife shall be entitled to receive this compensation directly from the U.S. government." The master awarded spousal maintenance to Danielson, with the amount dropping to $1 per year once she began to receive her portion of Evans's military retirement benefits. The master noted, however, that, "[e]xcept for the future receipt of retirement benefits, [Danielson's] situation would rise to the level of a permanent award of spousal maintenance [until] death or remarriage." Danielson remarried after the dissolution.

¶ 4 The Colorado court's dissolution decree in August 1993 incorporated by reference the master's findings and conclusions. In December 1994, Evans received retirement orders for a non-disability retirement, effective September 30, 1995. On Evans's request for

clarification of the master's findings, and after the Colorado court referred that request to the master, in 1995 the master reduced Danielson's interest in Evans's military retirement benefits to 35.5 percent[1] and further found:

> In the event husband voluntarily diminishes the dollar value of his net disposable pay (predicated upon 21 years of active service at the status of Lt. Colonel) or should husband merge or otherwise diminish the dollar value of the gross military benefits wherein wife's interests are detrimentally affected, the Court of Colorado shall reserve jurisdiction to compensate wife for such diminution.

The master later denied Evans's motion for reconsideration.

¶ 5 At the time of the dissolution in 1993, both parties were in good physical and emotional health but were aware that Evans had suffered an injury during his military training in 1977. The Arizona trial court in this action found, and Danielson does not specifically contest, that before the dissolution both parties were aware of "the potential to declare a portion of retired pay as disability pay" and of the fact that "federal retirement pay was community property while federal disability pay was separate property." Danielson testified below, however, that during the marriage she had had no "reason to believe that [Evans] was disabled." It is undisputed that at the time of the dissolution, Evans had neither applied for nor received any disability rating by the government.

¶ 6 On September 30, 1995, Evans retired from the Army and also completed an eligibility application for Veterans' Administration (VA) disability benefits. He identified service-related disabilities consisting of angioedema and injuries suffered in the 1977 training fall. As the trial court found, Evans's application "set in motion a staggered series of disability ratings and increases." Beginning in February 1996, Evans received several notifications from the VA concerning its evaluation of his disability rating. Over time, that rating incrementally increased from twenty percent, retroactive to November 1, 1995, to seventy percent.

¶ 7 From October 1, 1995 through July 1996, Evans paid $757.19 per month directly to Danielson for her percentage share of his military retired pay. Federal law, however, required Evans to waive, dollar for dollar, his net disposable retired pay to the extent of any disability payments he received, thus reducing his retired pay but not his overall monthly benefits.[2] *See* 38 U.S.C. § 5305; *Mansell*, 490 U.S. at 583, 109 S.Ct. at 2026, 104 L.Ed.2d at 682. Consequently, beginning in August 1996, the federal government began sending Danielson payments that represented her 35.7 percent share of only the non-disability related portion of Evans's benefits. As he waived increasingly greater portions of his retired pay due to his application for and receipt of increased disability ratings, the value of Danielson's 35.7 percent share of the net disposable retired pay consequently decreased. Thus, as of early 2000, she was receiving only $130.66 per month.

¶ 8 In May 1996, the Colorado court entered a stipulated order concerning division of Evans's disposable military retired pay. Danielson and her Colorado counsel were actively involved in the drafting of that order, which stated in part that the Colorado court had "previously entered its Final Order dated August 6, 1993 ... [and] ... reserved jurisdiction to enter its Orders regarding the division of military retired pay upon the retirement of [Evans] from the military service." The order further provided that Danielson "will receive as and for her portion of [Evans's] disposable military retired pay, 35.7%" and that "[this] confirms the division of military retired pay contained in the Decree of Dissolution entered on August 6, 1993." Finally, the stipulated order stated that the Colorado court "shall retain jurisdiction over this matter, and in particular shall

---

1. The parties later stipulated that the correct percentage is 35.7 percent.

2. Unlike military retired pay, VA disability payments are nontaxable to the recipient. *See* 38 U.S.C. § 5301(a); *Absher v. United States*, 9 Cl.

Ct. 223 (1985), *aff'd*, 805 F.2d 1025 (Fed.Cir. 1986). Because of that tax incentive, disabled veterans often waive retired pay in favor of disability benefits. *See Mansell*, 490 U.S. at 583–84, 109 S.Ct. at 2026, 104 L.Ed.2d at 682.

retain jurisdiction through the reserve jurisdiction method of dividing the parties' military retirement asset." At the time of the stipulated order, Danielson was not aware that Evans already had waived some retired pay for disability benefits.[3]

¶ 9 In July 1996, at Evans's request, the case was transferred from Colorado to Arizona. In April 1999, Danielson filed a petition for order to show cause in Pima County Superior Court, requesting a finding of contempt against Evans for his failure to pay her 35.7 percent of his total military pay including the disability portion, not just 35.7 percent of the retired pay portion. She sought judgment for 35.7 percent of the past due and future combined benefit of both retired pay and disability benefits or, alternatively, a permanent award of spousal maintenance in an amount equal to the difference between 35.7 percent of the combined benefit and 35.7 percent of only the retired pay portion.

¶ 10 After an evidentiary hearing in February 2000, the trial court (J. Stanford) entered detailed findings of fact and ruled, inter alia, that "[t]he parties are bound by the [Colorado court's] original decree" for payments made before May 1996, and by that court's "post-decree order" for payments made thereafter. The trial court further concluded that the parties had intended the May 1996 stipulated order to "confirm[] the original order" in a form acceptable to "secure direct federal payment," and had not intended to "change the value of the benefits confirmed and divided at the time of the original decree."

¶ 11 Accordingly, the trial court ruled that, "[u]nder the terms of the original decree and state law,[4] [Danielson] is entitled to [35.7]% of the combined benefit regardless of the subsequent disability transmutations under federal law." The court further ruled that Danielson's "interests were finally determined on the date of the decree regardless of the subsequent unilateral transmutations." The trial court ordered that Danielson "shall receive 50 percent of the disposable retired pay directly" from the government and that Evans "shall pay directly to [Danielson] the difference between 50 percent of the retired pay portion" and 35.7 percent of the combined benefit. The court also awarded attorney's fees and costs to Danielson. Evans timely appealed from Judge Stanford's order.

¶ 12 Thereafter, when Evans failed to comply with that order, Danielson filed another petition for order to show cause in November 2000. After an evidentiary hearing in February 2001, at which time Danielson was receiving the entire balance of Evans's disposable retired pay in the amount of $251 per month, the trial court (J. Nygaard) declined to reconsider Judge Stanford's earlier order that had awarded Danielson 35.7 percent of the combined benefit. The trial court found that Evans had "failed to make all but a small portion of the payments" previously ordered and had "presented no credible evidence of his inability to make the payments."[5] Accordingly, the court found Evans in contempt and ruled that he could "purge himself of contempt by paying to [Danielson] all past due amounts together with interest thereon and by making all future payments when due." After Evans appealed from that contempt order, this court consolidated the two

3. When the stipulated order was entered in May 1996, Evans's disability rating was twenty percent. The trial court found that "both parties were aware" of that fact at that time. That finding, however, is clearly erroneous. Danielson testified below that when the stipulated order was entered, she had neither known that Evans "had applied to convert military retirement benefits to VA disability" nor had she had "any reason to know that he might attempt to do that." Similarly, Evans acknowledged that, although he had known for several months before the May 1996 order of his first retirement to disability conversion, he had not notified Danielson of that fact.

4. The trial court noted that "[n]either party argues Colorado law must be applied in this matter" and that, in any event, the parties and the court had found no applicable Colorado cases that address the issues raised here. Similarly, neither the parties nor amici curiae contends on appeal that Colorado law, whatever it may be, applies.

5. As of the February 2001 hearing, Evans's benefits totaled $4,342 per month, consisting of $2,573 in VA disability benefits, $1,218 in Social Security disability, and $300 in special disability benefits, with the balance of $251 distributed by the government and Evans to Danielson.

**406**

appeals and obtained supplemental briefs from the parties.

### STANDARD OF REVIEW

■ ¶ 13 We defer to a trial court's factual findings and will overturn them only if they are clearly erroneous. *See* Ariz. R. Civ. P. 52(a), 16 A.R.S., Pt. 1; *In re Marriage of Yuro*, 192 Ariz. 568, ¶ 3, 968 P.2d 1053, ¶ 3 (App.1998). In addition, we review a trial court's order relating to apportionment of community property for an abuse of discretion. *Hrudka v. Hrudka*, 186 Ariz. 84, 93, 919 P.2d 179, 188 (App.1995). This case, however, involves largely undisputed facts and essentially hinges on interpretation of statutes and an out-of-state decree and order, issues that are subject to our de novo review. *See Citibank (Arizona) v. Bhandhusavee*, 188 Ariz. 434, 435, 937 P.2d 356, 357 (App.1996); *see also Anderson v. Anderson*, 522 N.W.2d 476, 478–79 (N.D.1994) ("[W]hen one court interprets the decree of another court, the interpreting court is in no better position than [the appellate court is] to determine the original judge's intentions should the decree contain ambiguities" and, thus, review of "such interpretations [is] *de novo*.").

### DISCUSSION

#### I. Retirement Benefits Order

¶ 14 Evans challenges the trial court's first order on multiple grounds. He initially contends the trial court failed to give effect to unambiguous language in the 1993 Colorado dissolution decree and the 1996 stipulated, post-decree order. Those documents, respectively, limit Danielson's 35.7 percent interest in Evans's retirement benefits to his "disposable pay, as defined by federal law" and his "disposable military retired pay." Pursuant to the Act, a state court may divide "disposable retired pay" as community property in dissolution proceedings. 10 U.S.C. § 1408(c). But "disposable retired pay" excludes any amounts a veteran must waive pursuant to 38 U.S.C. § 5305 "in order to receive [disability] compensation under ... title 38." 10 U.S.C. § 1408(a)(4)(B). Thus, Evans argues, the dissolution decree and

stipulated order that Danielson helped to prepare preclude her from receiving any share of his disability benefits, "whether paid directly or indirectly."

■ ¶ 15 Evans's argument overlooks several points. First, the dissolution decree incorporated the special master's statement that, "[u]pon retirement, wife is expected to receive $700.00 to $800.00 per month in lifetime assistance." That language suggests that, despite prescribing Danielson's interest "in terms of a percentage," *Harris*, 195 Ariz. 559, ¶ 19, 991 P.2d 262, ¶ 19, the master did not intend that her interest "would increase or decrease depending on [Evans's] disability payments," even had the master known of the potential for such payments at the time of the dissolution. *Id.* at ¶ 16. *See also Gaddis*, 191 Ariz. at 470, 957 P.2d at 1013; *In re Marriage of Krempin*, 70 Cal.App.4th 1008, 83 Cal.Rptr.2d 134, 142 (1999). *But see In re Marriage of Pierce*, 26 Kan.App.2d 236, 982 P.2d 995, 996–97 (1999). Thus, to the extent possible at that time, the master quantified the value of Danielson's interest in Evans's future retirement benefits.

¶ 16 Second, pursuant to Evans's request, the master subsequently clarified any ambiguity in his findings, stating that if Evans were to "diminish the dollar value of the gross military benefits" and thereby detrimentally affect Danielson's interest, the court would reserve jurisdiction "to compensate [her] for such diminution." *See Hisgen v. Hisgen*, 554 N.W.2d 494, 497 (S.D.1996) ("While a property division is irrevocably fixed by the terms of the divorce decree and cannot be later modified, if indeterminate language was employed, a court may clarify its decree and the agreement it was based upon."). *But cf. In re Marriage of Zale*, 193 Ariz. 246, ¶ 1, 972 P.2d 230, ¶ 1 (1999) ("[T]he parol evidence rule does not apply to a judgment."). The master's clarified finding, apparently made without resorting to parol evidence, reflects that he did not intend to permit a reduction in value of Danielson's interest in the military retired pay based on Evans's subsequent actions or on the technical, government-required reference to "dis-

posable pay" in the original decree.[6]  *Cf. Anderson,* 522 N.W.2d at 478 (when a trial court clarifies its own prior judgment, "logic suggests we should afford such a clarification considerable deference").

¶ 17 Third, notwithstanding the references to "disposable military retired pay" in the 1996 stipulated order, the trial court found that that order had merely "confirm[ed] the original order" and had been intended and designed "to secure direct federal payment," not "to change the value of the benefits confirmed and divided at the time of the original decree." As a matter of law, we agree with the trial court's legal interpretation of the Colorado decree and order on their face. Although evidence in the record also supports the trial court's findings, our conclusion does not depend on that evidence. *See Zale* (trial court erred in admitting parol evidence as to parties' intent and understanding concerning duration of spousal maintenance ordered in dissolution decree). *But see Krempin,* 83 Cal.Rptr.2d at 143; *cf. Harris,* 195 Ariz. 559, ¶ 23, 991 P.2d 262, ¶ 23 ("nothing precludes" trial court on remand from determining parties' intent as to military benefits provision and "clarifying its decree accordingly").

¶ 18 Finally, as the trial court noted, the language in the original decree and post-decree order is substantially similar to the order in *Gaddis* that referred to the former wife's percentage of " 'disposable military retirement pay as calculated by the [government].' " 191 Ariz. at 468, 957 P.2d at 1011. Notwithstanding that language, we rejected the military husband's argument that his post-dissolution waiver of retired pay in order to receive civil service compensation required a corresponding reduction in the retirement benefits that the dissolution decree had awarded to his former wife. *Id.* at 469, 957 P.2d at 1012. We likewise reject Evans's first argument here.

¶ 19 Evans and amicus curiae American Retirees Association (ARA) next contend federal law, specifically 10 U.S.C. § 1408 and *Mansell,* bars a former non-military spouse from acquiring any property interest, directly or indirectly, in disability benefits paid to a veteran. We agree. But we disagree with their related assertion that federal law also precluded the trial court from ordering "make up" payments from other sources.

¶ 20 Evans and ARA argue that the trial court's order circumvents Congressional intent and violates the Supremacy Clause of the federal constitution, United States Constitution article VI, clause 2, by requiring a disabled veteran to make "payments-in-kind" so as to "make up" for any retired pay waived in order to receive disability benefits. The practical effect of that indirect approach, they maintain, is the same as directly awarding the former spouse a portion of the military retiree's disability pay, a result that federal law clearly prohibits. *See Mansell; Clauson v. Clauson,* 831 P.2d 1257, 1262–64 (Alaska 1992); *Pierce.* According to ARA, a state court may not award as community property, either directly or indirectly, amounts of retired pay a veteran waives in order to receive VA disability benefits, regardless of (1) when the waiver occurs; (2) the former spouse's interest in or entitlement to military retired pay pursuant to the dissolution decree; and (3) any "economic harm" to the former spouse resulting from the waiver.

¶ 21 This court rejected similar arguments in *Gaddis,* as did Division One of this court in *Harris.* In *Gaddis,* we concluded that "Arizona law does not permit, and federal law does not require," reduction of a former spouse's decreed interest in military retirement benefits based on the retired veteran's post-dissolution waiver of those benefits in order to receive civil service compensation. 191 Ariz. at 469, 957 P.2d at 1012. Accordingly, we upheld the trial court's order that had compelled the husband to pay " 'the original, actual value' " of the wife's interest in the retirement benefits. *Id.* at

6. The trial court determined that because the master's clarification order, though filed with the Colorado court, was never formally adopted by that court or incorporated in any subsequent court order, it "is not a binding order." Nonetheless, the master's clarification reflects his intent in issuing the initial findings, which the Colorado court adopted and included in its decree.

468, 957 P.2d at 1011. We found no violation of federal law because the trial court " did not divide a portion of retirement pay that had been waived due to civil service employment at the time of the decree." *Id.* at 470, 957 P.2d at 1013. And we distinguished *Mansell* because the dissolution decree there had "awarded the wife a community property interest in the portion of retirement pay the husband already had waived to receive disability benefits and thus directly conflicted with the requirements of 10 U.S.C. §§ 1408(a)(4)(B) and 1408(c)." *Id.*

¶ 22 In *Harris,* the dissolution decree awarded the non-military wife " '[o]ne-half of [husband's] Military Retirement, not including [husband's] disability payment." ' 195 Ariz. 559, ¶ 2, 991 P.2d 262, ¶ 2 (alteration in original). The husband's disability rating was sixty percent at that time, but he subsequently obtained additional ratings that ultimately "transform[ed] all of [his] non-disability retirement pay into disability benefits." *Id.* at ¶ 7. Applying the reasoning in *Gaddis,* the court in *Harris* concluded that federal law did not preclude the wife from seeking "the value of the non-disability retirement [pay]" she had been awarded in the prior dissolution decree, *id.* at ¶ 5, without reduction for retired pay the husband waived post-decree in order to receive additional disability benefits. *Id.* at ¶ 13.

¶ 23 According to Evans, *Gaddis* and *Harris* rest on "fallacies" about "vested" rights and "unilateral" or "voluntary" choices that do not apply here. For example, he contends Danielson's interest in his retirement benefits was "vested" only "in the sense that no one else [could] claim a right to them." That interest, he asserts, neither entitled Danielson to a fixed, lifetime benefit nor guaranteed that his "disposable retired pay" would not change. Rather, Evans argues, the value of Danielson's interest in his retirement benefits was "contingent" on future circumstances, including his "suffering the disabling consequences of a service related injury" after the dissolution and after his retirement.

¶ 24 The problem with that argument is that neither the record nor the law supports it. The dissolution decree and post-decree order did not condition Danielson's interest in the military retirement benefits on anything, let alone on Evans's unforeseen future disability ratings and corresponding waivers of retired pay. And, as discussed above, the special master's 1995 clarification essentially negated the contingency Evans now postulates. Moreover, the trial court did not find, and implicitly rejected, any condition subsequent that could reduce or otherwise affect Danielson's decreed interest in the retirement benefits. In short, her interest was no less "vested" than the interests of the non-military former spouses in *Gaddis* and *Harris. See Johnson v. Johnson,* 37 S.W.3d 892, 894, 897 (Tenn.2001) (holding that when parties' marital dissolution agreement "divides military retirement benefits, the non-military spouse obtains a vested interest in his or her portion of those benefits as of the date of the court's decree" and that such "vested interest cannot thereafter be unilaterally diminished by an act of the military spouse").

¶ 25 Evans also contends that, unlike the husband in *Gaddis* who voluntarily obtained civil service employment, he did not voluntarily choose to "suffer[ ] from a service related disability." Of course that may be true, and Evans certainly had the right to apply for and obtain nontaxable VA disability benefits in lieu of retired pay. But Evans concedes he unilaterally and voluntarily applied for the disability benefits, without notice to Danielson and without any suggestion in the dissolution proceedings that he might do so. *See Harris,* 195 Ariz. 559, ¶ 13, 991 P.2d 262, ¶ 13. *See also Scheidel v. Scheidel,* 129 N.M. 223, 4 P.3d 670, 675 (App.2000) (affirming trial court's determination that husband's post-dissolution "application for an increased disability rating was voluntary, and in furtherance of his own financial interests"). At any rate, the nature, extent, and enforceability of Danielson's interest in the retirement benefits do not hinge on the voluntariness of Evans's post-dissolution actions in the disability process.

¶ 26 In sum, *Gaddis* and *Harris* pose major obstacles to the arguments advanced by Evans and ARA. Despite the attempts to distinguish those cases on their facts, the fundamental principles recognized and ap-

plied in *Gaddis* and *Harris* apply here and undermine Evans's position. The thrust of his and ARA's arguments is in essence an attack on the rationale, if not the results, in those two cases. Accepting Evans's position would require us to either overrule *Gaddis* and reject *Harris* or distinguish them on grounds that are insignificant and unpersuasive. We are not inclined to do so.[7]

¶ 27 In our view, *Gaddis* was correctly decided and its principles remain intact. Indeed, other state courts have relied on it in rejecting arguments similar to Evans's. *See Krempin; Johnson.But see Clauson,* 831 P.2d at 1264 (trial court may not "simply shift an amount of property equivalent to the waived retirement pay from the military spouse's side of the ledger to the other spouse's side" and may not treat disability benefits, "either in form or substance, ... as marital property subject to division"); *Pierce,* 982 P.2d at 998, 999 (trial court "may not do indirectly what it cannot do directly" by reopening final dissolution decree to award "additional property or more payments" to non-military spouse to compensate for "an asset which has significantly declined in value"). And, our decision here is consistent with the majority view in this country. *See Krempin,* 83 Cal.Rptr.2d at 137, *quoting* Fenton, *Uniformed Services Former Spouses' Protection Act and Veterans' Disability and Dual Compensation Act Awards,* Army Law., Feb. 1998, 31, 33 (noting a " 'growing trend' " among courts to ensure that former spouses' property interests are protected in the event of a future VA disability award to the service member); *Pierce,* 982 P.2d at 1000 (reaching an outcome that varied from "the majority of decisions in this type of case").

¶ 28 *Harris,* of course, is both factually and legally closer to this case than *Gaddis.* "Absent a decision by the Arizona Supreme Court compelling a contrary result, a decision by one division of the Court of Appeals is persuasive with the other division." *Scappaticci v. Southwest Sav. & Loan Ass'n,* 135 Ariz. 456, 461, 662 P.2d 131, 136 (1983). Although we are not "absolutely bound" by *Harris,* we consider it "highly persuasive and binding, unless we are convinced that [it is] based upon clearly erroneous principles, or conditions have changed so as to render [it] inapplicable." *Castillo v. Industrial Comm'n,* 21 Ariz.App. 465, 471, 520 P.2d 1142, 1148 (1974). Finding no compelling basis for rejecting *Harris,* we adopt and follow it.

¶ 29 In doing so, however, we are cognizant of potential inequities that may result to disabled military retirees in some circumstances. Indeed, Evans contends the trial court's order inequitably divides the parties' community property because it discriminates against a disabled veteran and permits his non-military former spouse to reap the benefits of his military service but not share in the burdens (including a service-related disability) of that service. As Evans hypothesizes, a disabled veteran who waives retired pay after a dissolution in order to receive disability benefits, and whose disability reduces or totally eliminates his or her earning capacity, may end up with less than a non-military former spouse who is able to work and earn income and yet still receives whatever he or she was awarded in the dissolution decree, unaffected by the veteran's post-dissolution waiver.

¶ 30 Nothing in the record before us suggests that Evans's hypothetical scenario exists here. But even if it did, Evans disre-

---

7. As we noted in *Gaddis,* our decision there conformed to prior Arizona law. 191 Ariz. at 469, 957 P.2d at 1012, *citing In re Marriage of Crawford,* 180 Ariz. 324, 327, 884 P.2d 210, 213 (App.1994) ("[A] community interest in military retirement benefits cannot be transformed into separate property by one spouse's electing to forego a portion of retirement pay in exchange for disability benefits."); *McNeel v. McNeel,* 169 Ariz. 213, 215, 818 P.2d 198, 200 (App.1991) (rejecting husband's attempt "to transform retirement benefits constituting community proper-

ty to disability benefits constituting separate property"). *See also Perras v. Perras,* 151 Ariz. 201, 726 P.2d 617 (App.1986) (to same effect). The results in *Gaddis, Harris,* and this case also appear consistent with the Act's savings clause. 10 U.S.C. § 1408(e)(6) ("Nothing in this section shall be construed to relieve a member of liability for ... other payments required by a court order on the grounds that payments made out of disposable retired pay under this section have been made in the maximum amount permitted under [§ 1408(e)(1) or (e)(4)(B) ].").

gards equitable considerations that favor Danielson. As the master found in the Colorado dissolution proceedings, Danielson "resigned her commission in the U.S. military in order to facilitate her homemaking activities" and "subordinated her career goals to facilitate the family expectation that she be the principal homemaker and caretaker of the children." *See* Mary J. Bradley, *Calling for a Truce on the Military Divorce Battlefield: A Proposal to Amend the USFSPA,* 168 Mil. L.Rev. 40, 49 (June 2001) ("[M]ilitary spouses contribute to the effectiveness of the military community while at the same time forgoing the opportunity to have careers and their own retirement.").

¶ 31 That various, post-dissolution contingencies may arise and allegedly produce inequities in a prior decree's division of community property does not justify "disturb[ing] property allocations in final divorce decrees," *Gaddis,* 191 Ariz. at 471, 957 P.2d at 1014, or upsetting parties' reasonable expectations based on those allocations. Nor do the possible ramifications of speculative future events on a prior division of property override the important policy favoring the finality of decrees and property settlements. *Id.* at 469, 957 P.2d at 1012; *see also* A.R.S. § 25–327(A); *De Gryse v. De Gryse,* 135 Ariz. 335, 338, 661 P.2d 185, 188 (1983); *cf. Jones v. Jones,* 900 S.W.2d 786, 788 (Tex.Ct.App.1995) (husband's attempt to reduce value of wife's interest in his military retired pay by accepting forty percent disability rating when he retired constituted improper "collateral attack on a final unappealed divorce decree").

■ ¶ 32 Evans alternatively proposes that we remand for the trial court to equitably reallocate the parties' community property by adjusting "the distribution of marital assets" based on the totality of current circumstances. *See Clauson,* 831 P.2d at 1259, 1264 (remanding to trial court more than four years after dissolution for hearing to reconsider equitable division of parties' marital assets in light of new circumstances, including "the economic consequences of [military spouse's post-dissolution] decision to waive military retirement pay in order to receive disability pay"); *Krempin,* 83 Cal. Rptr.2d at 138 (noting that "[s]ome courts have found that the waiver of retirement pay and resulting reduction in the pension payment to the non-military [former] spouse were changed circumstances which permitted reassessment of support payments or redistribution of marital property"). That proposal, however, circumvents the policy of finality, conflicts with Rule 60(c), Ariz. R. Civ. P., 16 A.R.S., Pt. 2, and is, at best, highly impractical. Both parties have embarked on new lives in the eight years since their marriage was dissolved, and any attempt to identify, trace, locate, and reapportion their community property now would be difficult if not impossible. We therefore reject Evans's proposal for remand as utterly infeasible and contrary to Arizona law.

¶ 33 In sum, the Colorado dissolution decree and that state's post-decree order did not improperly treat disability benefits as community property or award any such benefits to Danielson. *See Hisgen,* 554 N.W.2d at 497 ("The [trial] court did not include the military disability payments as part of the marital property division and thus did nothing to infringe upon federal law."). Nor did the trial court here do so. Despite language in the trial court's order that Danielson is "entitled to" her 35.7 percent interest in "the combined benefit," we construe the order as merely recognizing and enforcing Danielson's vested interest in Evans's retirement benefits established in the decree. The order does not, and under federal law cannot, grant Danielson any interest in or entitlement to any portion of Evans's disability benefits; nor does the order require Evans to satisfy any of his obligations to Danielson from those sources. *See* 10 U.S.C. § 1408(a)(4)(B), (c)(1); 38 U.S.C. § 5301(a);[8] *Mansell; Clauson.* Because Judge Stanford's order of June 20, 2000 is compatible

---

8. Section 5301(a), 38 U.S.C., provides: "Payments of [VA disability] benefits ... shall not be assignable except to the extent specifically authorized by law, and ... shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary."

with Arizona law and does not clearly violate federal law, it is affirmed.

## II. Contempt Order

¶ 34 In his appeal from the trial court's contempt order, Evans concedes that he "failed to pay the bulk" of the amounts the court had awarded to Danielson. He contends, however, that the contempt order violates federal law, under which "military and Social Security disability payments are completely exempt from attachment or assignment, and are for the use of the disabled recipient only." *See* 38 U.S.C. § 5301(a); 42 U.S.C. § 407(a).[9] Although Evans raises a very interesting issue, our ability to review and decide it is severely constrained by jurisdictional defects that neither party mentions and by a scant record that does not clearly support the factual assertions on which his argument is based.

¶ 35 Addressing sua sponte our own subject matter jurisdiction, we first note that this court lacks such jurisdiction over an appeal from a civil contempt adjudication. *See Berry v. Superior Court*, 163 Ariz. 507, 788 P.2d 1258 (App.1989); *Pace v. Pace*, 128 Ariz. 455, 626 P.2d 619 (App.1981). In the exercise of our discretion, however, we treat Evans's appeal from the contempt order as a petition for special action, accept special action jurisdiction, and preliminarily examine whether the trial court had jurisdiction to enter that order. *See Lloyd v. State Farm Mut. Auto. Ins. Co.*, 189 Ariz. 369, 375, 943 P.2d 729, 735 (App.1996); A.R.S. § 12–120.21(A)(4).

¶ 36 "Whether the court had jurisdiction to enter the order from which this appeal has been taken is a matter we may address, although neither of the parties has raised it." *Don L. v. Arizona Dep't of Econ. Sec.*, 193 Ariz. 556 n. 1, 975 P.2d 146 n. 1 (App.1998). *See also Swichtenberg v. Brimer*, 171 Ariz. 77, 82, 828 P.2d 1218, 1223 (App.1991) ("Subject matter jurisdiction cannot be waived, and can be raised at any stage

of the proceedings."). "We independently review as a matter of law the jurisdiction of lower tribunals that have made rulings in a case before us." *Decola v. Freyer*, 198 Ariz. 28, ¶ 8, 6 P.3d 333, ¶ 8 (App.2000). *See also In re Marriage of Dorman*, 198 Ariz. 298, ¶ 6, 9 P.3d 329, ¶ 6 (App.2000).

¶ 37 A trial court retains "continuing jurisdiction to enforce its orders for [child] support and [spousal] maintenance, by means of a petition for contempt proceedings to enforce the order," regardless of a pending appeal from the underlying order that had imposed the support and maintenance obligations. *Dyer v. Dyer*, 92 Ariz. 49, 52, 373 P.2d 360, 363 (1962). *See also Rose v. Rose*, 481 U.S. 619, 107 S.Ct. 2029, 95 L.Ed.2d 599 (1987); A.R.S. § 25–325(A); *Kabat v. Nordensson*, 152 Ariz. 438, 733 P.2d 635 (App.1986). Support and spousal maintenance payments, however, "are clearly differentiated from property settlement payments, the latter of which cannot be enforced by contempt proceedings." *Proffit v. Proffit*, 105 Ariz. 222, 225, 462 P.2d 391, 394 (1969) (holding that trial court's contempt order based on defaulting spouse's failure to comply with prior court order directing her to pay a sum of money awarded to ex-spouse violated article II, § 18 of Arizona Constitution and, therefore, vacating contempt order). *See also Masta v. Lurie ex rel. Superior Court*, 22 Ariz.App. 170, 171, 525 P.2d 301, 302 (1974) (Section 25–317(E), A.R.S., does not authorize contempt "to enforce the payment of monetary sums ordered in the settlement of property rights."); Charles Marshall Smith & Irwin Cantor, *Arizona Practice, Marriage Dissolution Practice* § 273, at 282 (1988) ("[P]ayment of one spouse's debt to the other, which is part of a property settlement, may not be enforced by contempt.").

¶ 38 Based on those authorities, the trial court lacked jurisdiction to hold Evans in contempt for his failure to make past due or future payments to Danielson for her 35.7 percent interest in "the combined

9. Section 407(a), 42 U.S.C., provides: "The right of any person to any future payment [of Social Security benefits] under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law."

[military] benefit," as Judge Stanford had ordered. "[A]ny action taken by a court which does not have jurisdiction is void and a nullity." *Solomon v. Findley*, 165 Ariz. 45, 46, 796 P.2d 477, 478 (App.1990), *approved*, 167 Ariz. 409, 808 P.2d 294 (1991). Accordingly, we vacate that part of the trial court's March 21, 2001 order that found Evans in contempt on that basis. We also vacate that order to the extent it found or threatened to find Evans in contempt for failing to make "all future payments when due" with respect to Danielson's original, pre-waiver interest in his retired pay.

¶ 39 The contempt order, however, is not totally invalid. In the initial order from which Evans's first appeal was taken, Judge Stanford also entered judgment in favor of Danielson in the amount of $8,000 for attorney's fees and court costs. Evans does not challenge that award on appeal. Danielson's second petition for order to show cause referred to that prior, unpaid award, as did the trial court's ensuing contempt order. And, in finding Evans in contempt, the trial court noted his failure "to make all but a small portion of the payments ordered by Judge Stanford." Thus, the contempt order presumably was based in part on Evans's failure to pay the attorney's fee and cost award.

¶ 40 A trial court may enforce orders for the payment of attorney's fees through civil contempt proceedings. *See Korman v. Strick*, 133 Ariz. 471, 652 P.2d 544 (1982); *Masta*, 22 Ariz.App. at 171, 525 P.2d at 302; *Johnson v. Johnson*, 22 Ariz.App. 69, 71, 523 P.2d 515, 517 (1974) ("[A]ttorney's fees awarded in a decree of divorce are enforceable by post judgment contempt in the same manner as alimony or child support could be enforced."); Smith & Cantor, § 273, at 281–82. Thus, the trial court had subject matter jurisdiction to find Evans in contempt for his admitted failure to comply with Judge Stanford's order that had awarded attorney's fees and costs to Danielson. Viewing that portion of the contempt order for an abuse of discretion, *see John Doe I v. Superior Court*, 149 Ariz. 169, 172, 717 P.2d 473, 476 (App. 1985), we find none.

¶ 41 Evans contends, however, "except for the non-exempt retirement benefits ($251) which are paid entirely to Danielson, and except for his minimal personal property, [he] does not have any other assets other than those he presently receives from exempt Veteran's Disability, Social Security Disability, and Special Disability payments." Because "his only present income and assets are derived from such disability payments," he argues, the contempt order in its entirety violates the aforementioned federal statutes. *See* ¶ 34, *supra.*

¶ 42 Evans's argument contains two major flaws. First, the record, viewed in the light most favorable to upholding the trial court's order, *Yuro*, 192 Ariz. 568, ¶ 3, 968 P.2d 1053; ¶ 3, does not clearly support Evans's factual assertions. Indeed, the record reflects that Evans had and used other, non-exempt assets at his disposal for purposes other than meeting his obligations to Danielson and has disposed of some assets (including an IRA and airplane) to generate cash. And, despite his VA disability rating, Evans did not establish below that he is unable to work or otherwise earn income. As the trial court found, Evans "presented no credible evidence of his inability to make the payments" that Judge Stanford previously had ordered. In short, Evans's argument—that he has no source or means of paying Danielson other than from his exempt disability benefit pool—lacks a supporting evidentiary basis in the record before us.

¶ 43 Second, the contempt order does not clearly violate federal law. The trial court neither ordered nor authorized any assignment, attachment, execution, levy, garnishment, or seizure of exempt disability payments. *See* 38 U.S.C. § 5301(a); 42 U.S.C. § 407(a). Nor did the trial court require Evans to satisfy his attorney's fee and cost obligation to Danielson by using disability benefits as his payment source. And, even assuming arguendo his disability benefits are "the only sources available to fulfill his financial obligations" to Danielson, "[t]he critical factor, for the purposes of complying with federal law, is that the court order does not specifically require that disability benefits provide the *source* of the funds paid to the non-military spouse." *Scheidel*, 4 P.3d at 674. *See also Harris*, 195 Ariz. 559, ¶ 23, 991

P.2d 262, ¶ 23 (military spouse "would not necessarily be required to use his exempt disability pay to satisfy his obligation to wife, but could satisfy it from any other available asset"); *Abernethy v. Fishkin,* 699 So.2d 235, 240 (Fla.1997); *Hisgen,* 554 N.W.2d at 498, *quoting Holmes v. Holmes,* 7 Va.App. 472, 375 S.E.2d 387, 395 (1988) (" '[T]he source of [the] payments need not come from his exempt disability pay; the husband is free to satisfy his obligations to his former wife by using other available assets.' ").

¶ 44 Because the Colorado dissolution decree and post-decree order "did not include the military disability payments as part of the marital property division" and because the trial court merely enforced Danielson's decreed right "to receive a certain monthly sum as her share of the [military retirement benefit], regardless of the source," no infringement of federal law occurred. *Hisgen,* 554 N.W.2d at 497–98.[10]

### DISPOSITION

¶ 45 Judge Stanford's order of June 20, 2000 is affirmed, as is that portion of Judge Nygaard's March 21, 2001 order that found Evans in contempt for his failure to pay the prior attorney's fee and cost award. The balance of the March 21, 2001 contempt order is vacated. In our discretion, because the case presents difficult and significant issues, we deny the parties' requests for an award of attorneys' fees on appeal.

BRAMMER, JR., P.J. and FLÓREZ, J., concur.

---

10. *Perkins v. Perkins,* 107 Wash.App. 313, 26 P.3d 989 (2001), cited by Evans, is inapposite. The trial court's original decree in that case violated federal law by dividing and distributing veteran's disability benefits. The court in *Perkins,* however, did not condemn the type of post-dissolution order Evans now challenges but rather specifically distinguished the issue presented here: "whether the [Act] allows a state dissolution court to restore, by an award of maintenance or otherwise, *service* benefits that were *properly* divided and distributed in an original decree; that were thereafter the recipient spouse's *separate* property; and that were later stripped from the recipient spouse by a waiver executed without her consent." *Id.* at 996 n. 57 (citations omitted).