IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**ASALIA GUADALUPE ALVAREZ-SOTO,**
*Appellant.*

No. CR-24-0281-PR
Filed November 28, 2025

Appeal from the Superior Court in Pinal County
The Honorable Jason Holmberg, Judge
No. S1100CR201703501
**AFFIRMED**

Opinion of the Court of Appeals, Division Two
258 Ariz. 417 (App. 2024)
**VACATED AND REMANDED**

COUNSEL:

Kristin K. Mayes, Arizona Attorney General, Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals, Jacob R. Lines (argued), Assistant Attorney General, Tucson, Attorneys for State of Arizona

Rosemary A. Gordon Pánuco (argued), Attorney for Asalia Guadalupe Alvarez-Soto

Seth M. Apfel (argued), Apfel Law Group, P.L.L.C., Phoenix; and David J. Euchner, Pima County Public Defender's Office, Tucson, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

VICE CHIEF JUSTICE LOPEZ authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER and JUSTICES BOLICK, BEENE, MONTGOMERY, KING, and CRUZ joined.

_____

VICE CHIEF JUSTICE LOPEZ, Opinion of the Court:

¶1      We consider two issues arising from a search and seizure of evidence and subsequent litigation to suppress it: (1) whether the trial court abused its discretion in denying Defendant's motion to suppress evidence of narcotics discovered during a traffic stop; and (2) whether *State v. Sweeney*, 224 Ariz. 107 (App. 2010), correctly states the appellate standard of review for video evidence. We hold that the trial court did not abuse its discretion because the trooper who conducted the traffic stop had reasonable suspicion to initiate the stop. We further hold that *Sweeney* does not correctly state the appellate standard of review for video evidence because appellate courts may not independently review evidence.

## BACKGROUND

¶2      On December 14, 2018, while patrolling Interstate 10 ("I-10") in Pinal County, Trooper Ashton Shewey ("Shewey") suspected Defendant, Asalia Guadalupe Alvarez-Soto, violated A.R.S. § 28-721(B) (impeding traffic flow by failing to drive in the right lane) and conducted a traffic stop.

2

¶3        During this stop, while processing a written warning, Shewey asked Defendant about her travel plans and requested her consent to search the vehicle, which Defendant declined.  Shewey then requested consent to conduct a canine sniff of the vehicle with his canine, Chili, and Defendant agreed.  Chili, trained to detect narcotics, alerted to the driver-side of the car, leading to a search that uncovered a suitcase in the trunk of the vehicle containing fifty-five pounds of marijuana.  Shewey arrested Defendant and the State charged her with possession and transportation of marijuana for sale.

¶4        Before trial, Defendant moved to suppress all evidence seized during the stop, arguing, in part, that Shewey lacked reasonable suspicion for a traffic violation.  At the evidentiary hearing, Shewey testified about his law enforcement experience, decision to initiate the traffic stop, and conduct during the stop.

¶5        Shewey began his law-enforcement career in 2009 with the Pinal County Sheriff's Department ("PCSD").  Before joining the PCSD, Shewey attended the Southern Arizona Law Enforcement Training Center Academy, where he received general training on traffic laws, illegal narcotics, felony codes, and basic traffic investigations.  He also attended a four-week post academy training and then completed an additional

fourteen-week field training program. During his time with the PCSD, Shewey became a patrol deputy, working in the Casa Grande, Stanfield, and Maricopa areas. His responsibilities included making traffic stops, responding to calls, and investigating criminal violations, thefts, burglaries, and any other calls made to the 911 dispatch center. While on patrol, he focused on drug interdiction.

¶6　　　After working on patrol for two years, the PCSD promoted Shewey to canine deputy in part due to his drug trafficking enforcement activities. The promotion required a physical, written, and oral board exam. Shewey began working as a canine deputy under the High Intensity Drug Trafficking Area task force. He worked as a PCSD canine deputy for about three years.

¶7　　　Shewey then joined the Arizona Department of Public Safety where he completed its twelve-week trooper academy, which included training on advanced traffic investigations. After completing his first year as a highway trooper, a prerequisite to serve as a canine trooper, Shewey became a canine trooper.

¶8　　　Shewey also testified that he knew drug-trafficking organizations often use Chevrolet Malibus, specifically models from 2002 to 2008, as "company vehicles"—vehicles used by narcotics couriers

operating out of border cities. Often, these company vehicles have a record of multiple United States–Mexico border crossings and are newly registered because trafficking organizations typically purchase them in the name of the person transporting the narcotics.

¶9        Shewey also testified that, in his experience, it is common practice on I-10 for troopers to stop vehicles traveling in the middle lane when traffic passes them on the right because § 28-721(B) mandates "all slower traffic stay to the right." Troopers enforce § 28-721(B) to deter collisions and erratic lane changes caused by slower vehicles remaining in the middle lane.

¶10        In describing Defendant's traffic stop, Shewey recounted that, while on patrol, he observed a 2007 Chevrolet Malibu traveling on I-10. He ran its plate through his license-plate reader and conducted a border crossings check on it. The results revealed that the vehicle was newly registered out of Nogales, Arizona, and recently crossed through the United States–Mexico border multiple times. This information interested Shewey because, based on his training and experience, it fit the profile for a company vehicle. Consequently, Shewey decided to follow Defendant and, if he observed a traffic violation, to initiate a stop.

¶11        Shewey followed Defendant's vehicle in the middle lane and observed it traveling three miles per hour over the posted seventy-five mile per hour speed limit. After "several minutes" and "several miles," the vehicle slowed to seventy miles per hour. When Defendant slowed, Shewey observed another vehicle, a red SUV, pass her in the right lane. Shewey's dashcam video, which was admitted into the evidentiary hearing record, captured Defendant driving in the middle lane and the red SUV passing her. Shewey decided to stop Defendant for violating § 28-721(B) because the red SUV passed her in the right lane, and she was traveling under the posted speed limit—indicators that she was driving less than the speed of traffic.

¶12        After the evidentiary hearing, the trial court ruled that "the stop was justified" and denied Defendant's motion to suppress. A jury convicted Defendant of both marijuana counts, and the court imposed concurrent five-year prison terms. Defendant appealed. The court of appeals, in a split opinion, vacated the convictions, holding that Shewey lacked reasonable suspicion to conduct a stop under § 28-721(B). *State v. Alvarez-Soto*, 258 Ariz. 417, 423 ¶ 22 (App. 2024). The State sought review in this Court. We granted review because this case presents a recurring

issue of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031, -4033(A)(1).

**DISCUSSION**

**I.**

¶13 We review a trial court's denial of a motion to suppress for an abuse of discretion, considering the evidence in the light most favorable to sustaining the ruling. *State v. Adair*, 241 Ariz. 58, 60 ¶ 9 (2016). On review, "we consider 'only the evidence presented at the suppression hearing.'" *State v. Mitcham*, 258 Ariz. 432, 437 ¶ 13 (2024) (quoting *State v. Thompson*, 252 Ariz. 279, 290 ¶ 26 (2022)). We defer to the trial court's factual findings if they are supported by the record but review de novo whether those facts establish reasonable suspicion. *See State v. Evans*, 237 Ariz. 231, 233 ¶ 6 (2015).

**A.**

¶14 The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV; *Carpenter v. United States*, 585 U.S. 296, 303 (2018). Thus, when a law enforcement officer unreasonably detains an individual in violation of the Fourth Amendment, the judicially created "exclusionary rule" allows

a court to exclude evidence obtained during the violation. *Mitcham*, 258 Ariz. at 441 ¶ 32.

¶15        "Law enforcement officers 'seize' individuals by temporarily detaining them during traffic stops." *Thompson*, 252 Ariz. at 290 ¶ 28. Under the Fourth Amendment, officers "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Therefore, an officer only needs reasonable suspicion to initiate a traffic stop. *See id.*

¶16        An officer's reasonable suspicion arises from both the combination of the officer's perception of the facts and his understanding of the applicable law. *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014). When determining whether an officer had reasonable suspicion, courts give deference to the officer's trained ability to distinguish between innocent and suspicious actions. *State v. Teagle*, 217 Ariz. 17, 24 ¶ 26 (App. 2007).

¶17        Reasonable suspicion exists when an officer has a particularized and objective basis for suspecting a violation. *Evans*, 237 Ariz. at 234 ¶ 8. Courts determine whether an officer had reasonable suspicion based on the totality of the circumstances, viewed in

consideration of the officer's training and experience. *Id.* "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014) (quotation altered)); *see also Sokolow*, 490 U.S. at 7.

¶18 Relevant here, the Arizona Legislature codified the reasonable suspicion standard for traffic violations in A.R.S. § 28-1594: "A peace officer or duly authorized agent of a traffic enforcement agency may stop and detain a person as is reasonably necessary to investigate an actual *or suspected* violation of this title . . . ." (Emphasis added.)

**B.**

¶19 We begin our de novo review to determine if the record establishes reasonable suspicion for the traffic stop by considering Shewey's understanding of the facts and relevant law. *See Heien*, 574 U.S. at 60–61. The traffic statute at issue in this case, § 28-721(B), states that:

> On all roadways, a person driving a vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall drive the vehicle in the right-hand lane then available for traffic or as close as practicable to the right-hand curb or edge of the roadway, except when overtaking and passing another vehicle

9

> proceeding in the same direction or when preparing for a left
> turn at an intersection or into a private road or driveway.

Based on the evidentiary hearing record, Shewey derived his understanding of § 28-721(B) from his training and nearly decade of law enforcement experience. From Shewey's perspective, Defendant's speed fluctuation—from seventy-eight to seventy miles per hour—while traffic in the right lane advanced, suggested that she was traveling below the normal speed of traffic. On these facts, combined with Defendant's failure to move into the right lane, Shewey's conclusion that a violation of the traffic statute "may be afoot" satisfied the Fourth Amendment's minimal reasonable suspicion threshold. *See Sokolow*, 490 U.S. at 7.

**¶20** Defendant contends that Shewey did not have the requisite reasonable suspicion to lawfully stop Defendant's vehicle because he misconstrued § 28-721(B)'s requirements. After an extensive analysis of the traffic laws, the court of appeals' majority determined Shewey lacked reasonable suspicion because his interpretation of § 28-721(B) "cast too wide a net." *Alvarez-Soto*, 258 Ariz. at 422 ¶ 21 (quoting *Sweeney*, 224 Ariz. at 107 ¶ 22). The court reasoned that Shewey's application of the statute was not objectively reasonable because it would subject all travelers to "virtually random seizures." *Id.* Specifically, it explained that Shewey lacked reasonable suspicion because he failed to sufficiently account for the

judicially discerned legislative intent to "provide some measure of flexibility in certain traffic statutes." *Id.* at 421 ¶ 17 (citing *State v. Livingston*, 206 Ariz. 145, 148 ¶ 10 (App. 2003), for the proposition that statutory language in A.R.S. § 28-729(1) "requiring drivers to remain 'as nearly as practicable' within a single lane, reflects an 'express legislative intent to avoid penalizing brief, momentary, and minor deviations outside the marked lines.'").

**¶21**      We are unpersuaded that *Livingston* supports the court of appeals' conclusion that Shewey lacked reasonable suspicion merely because Defendant's driving involved a "brief, momentary, and minor deviation" from § 28-721(B)'s requirements. We concur with the conclusion in the court of appeals' dissenting opinion that the record reflects Defendant's continued violation of the statute "rather than a brief and momentary one." *Alvarez-Soto*, 258 Ariz. at 425 ¶ 32 (Gard, J., dissenting). We need not revisit *Livingston*'s holding because this case is factually distinguishable.

**¶22**      We similarly reject the majority's assertion that Shewey's interpretation of § 28-721(B) would require drivers to violate our speeding laws to comply with the statute. *Id.* at 421–22 ¶¶ 18–19. As the dissent notes, Defendant had "multiple ways to adjust her driving in the minutes

11

leading up to the stop to ensure compliance with all laws including, at a minimum, by immediately falling in behind the vehicle in the right-hand lane when it became obvious that its speed exceeded hers." *Id.* at 424 ¶ 30 (Gard, J., dissenting).

¶23 The court of appeals also incorrectly reframed the question before it as one of statutory interpretation rather than constitutional reasonableness. *Id.* at 421 ¶ 16 ("We address whether drivers on Arizona's highways are compelled by § 28-721(B) to move from the middle lane to the right lane if they are passed by a lone vehicle on the right when the state has failed to elicit any testimony as to the speed of that vehicle."). Whether Defendant in fact violated § 28-721(B) is a question for a traffic court; it is not dispositive of the validity of a seizure under the Fourth Amendment. *See Evans*, 237 Ariz. at 234 ¶ 7 ("The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." (quoting *Sokolow*, 490 U.S. at 7)).

¶24 The Fourth Amendment does not require an Arizona officer to interpret every traffic provision with "some measure of flexibility" before initiating an investigatory stop; it requires only that the officer have a particularized and objective basis to *suspect* that a violation *may* have occurred. *See Terry*, 392 U.S. at 21–22; *Sokolow*, 490 U.S. at 7. An officer's

12

reasonable mistake about the facts or the relevant law does not preclude reasonable suspicion. *Heien*, 574 U.S. at 60–61 ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)) (citation modified)). In fact, reasonable suspicion may rest on an objectively reasonable mistake of law when the statute's application "requires hard interpretive work." *Id.* at 70 (Kagan, J., concurring); *State v. Stoll*, 239 Ariz. 292, 296 ¶ 15 (App. 2016). Therefore, the question before us is whether Shewey's understanding of § 28-721(B) was objectively reasonable. *See generally Heien*, 574 U.S. at 66.

**¶25**        The phrase "normal speed of traffic at the time and place and under the conditions then existing" in § 28-721(B) provides no quantitative metric. Thus, reasonable minds may differ about its interpretation and application. Indeed, the fact that the court of appeals' majority and dissenting opinions, as well as the parties in this case, each offered competing interpretations confirms that the statute's application is subject to legitimate debate. Accordingly, we conclude that if trial and appellate judges cannot reach consensus on the statute's proper application even after exhaustive statutory analysis—"hard interpretive work"—we cannot deem

an officer's real-time literal interpretation of the law to be objectively unreasonable. *Heien*, 574 U.S. at 70 (Kagan, J., concurring); *cf. State v. Weakland*, 246 Ariz. 67, 73 ¶ 20 (2019) (applying the good faith exception to the exclusionary rule because "[i]t is unreasonable to require the police to predict a shift in the law when our trial and appellate courts failed to do so").

**¶26** The statutory phrase "normal speed of traffic" may be ambiguous and perhaps provides fodder for a spirited defense against a § 28-721(B) citation in traffic court. But the issue before us is not whether Shewey's stop would result in an adjudicated traffic offense. Even if Shewey misinterpreted the law, reasonable suspicion survives if his mistake was objectively reasonable under the circumstances. *See Heien*, 574 U.S. at 61 ("[R]easonable men make mistakes of law, . . . and such mistakes are no less compatible with the concept of reasonable suspicion."). Shewey routinely enforced § 28-721(B) and testified it was common practice for troopers to stop vehicles traveling in the middle lane when traffic passes them on the right. He observed Defendant traveling below the speed limit, which prevented him from traveling the speed limit in the middle lane, and then witnessed the red SUV pass her in the right lane, after which she failed to move to the right. The court of appeals' conclusion that Defendant was

penalized solely for being passed is inaccurate. *Alvarez-Soto*, 258 Ariz. at 421–22 ¶ 18. These facts establish that Shewey's belief was grounded in experience and a reasonable interpretation of the statute. Thus, further inquiries into alternative statutory bases for the stop or potentially innocent explanations for Defendant's conduct, such as her slowing below the speed limit upon noticing Shewey's vehicle, are unnecessary.

¶27 Defendant nevertheless argues that Shewey's pre-traffic-stop knowledge of her vehicle's border crossings and registration in Nogales cannot justify the seizure. We agree that those background factors—shared by many lawful motorists—are too generalized to constitute reasonable suspicion on their own. *See Sweeney*, 224 Ariz. at 113 ¶ 22 ("[C]ircumstances or factors that do not reliably distinguish between suspect and innocent behaviors are insufficient to establish reasonable suspicion . . . ."). But the State does not justify Shewey's stop on this basis. Indeed, as Defendant conceded at oral argument before us, Shewey's motive for the traffic stop is immaterial under the Fourth Amendment because the constitutional inquiry is whether his justification for the stop was reasonable. *Jones v. Sterling*, 210 Ariz. 308, 311 ¶¶ 10–11 (2005) ("[E]vidence seized as a result of a traffic stop meeting 'normal' Fourth Amendment standards is not rendered inadmissible because of the subjective motivations of the police

who made the stop."). Shewey's consideration of these factors in deciding to follow Defendant's vehicle does not undermine his objectively reasonable basis for the stop under § 28-721(B).

¶28 Viewing the totality of the circumstances, Shewey's decision to initiate a brief investigatory stop was reasonable under the Fourth Amendment. His interpretation of § 28-721(B) was objectively reasonable, his observations of Defendant's driving supported his suspicion that she was traveling "less than the normal speed of traffic," and his actions reflected his professional judgment rather than arbitrary enforcement. *See Glover*, 589 U.S. at 380; *Evans*, 237 Ariz. at 234 ¶ 7. Accordingly, the trial court did not abuse its discretion by denying Defendant's motion to suppress.

## II.

¶29 We next consider whether *State v. Sweeney*, which implies that appellate courts should conduct de novo review of video evidence, correctly states the appellate standard of review. 224 Ariz. at 111 ¶ 12 (positing that appellate courts should conduct an "independent review" of video evidence because "the trial court is in no better position to evaluate the video than the appellate court"). We hold *Sweeney* conflicts with this

Court's long-standing principle that appellate courts may not independently review evidence.

¶30    We briefly note that *Sweeney*'s novel departure from our appellate standard of review is premised entirely on two inapposite cases—*Danielson v. Evans*, 201 Ariz. 401, 406 ¶ 13 (App. 2001), and *State v. McCoy*, 692 N.W.2d 6, 29 (Iowa 2005). *Sweeney*, 224 Ariz. at 111 ¶ 12. *Danielson* did not involve video evidence, but rather the interpretation of statutes and a divorce decree—both subject to de novo appellate review. 201 Ariz. at 406 ¶ 13. In *McCoy*, the Iowa Supreme Court reviewed video evidence and affirmed the trial court's factual findings. 692 N.W.2d at 29. The court applied de novo review, not as a departure from appellate deference to trial court fact-finding, but as the requisite standard of review for an ineffective assistance of counsel claim. *Id.* Neither case justifies *Sweeney*'s call for "independent" appellate review.

¶31    *Sweeney*'s "independent" appellate review standard also conflicts with our jurisprudence. In *Adair*, we reaffirmed that appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion, viewing the evidence presented at the suppression hearing in the light most favorable to sustaining the ruling. 241 Ariz. at 60 ¶ 9. We defer to the trial court's factual findings if they are reasonably supported

by the record but review de novo the ultimate constitutional question presented in the motion to suppress. *Id.* (citing *Evans*, 237 Ariz. at 234 ¶ 6). The State argues that *Sweeney* improperly allowed the court of appeals to substitute its view of the evidence for the trial court's credibility findings, while Defendant contends that a purely visual record warrants independent appellate review. Both arguments misinterpret the standard stated in *Adair*. *Adair*'s framework already incorporates video evidence within the ordinary standard of review and reflects Arizona's long-standing rule that distinguishes deference to factual findings from de novo review of legal conclusions.

**¶32** *Sweeney*'s approach, and the court of appeals' reliance on it here, rests on the erroneous premise that an appellate court conducts de novo review of the trial court's fact-finding when the record includes a video. *Alvarez-Soto*, 258 Ariz. at 420 ¶ 10. Although it is obvious that both courts can view the same recording, the trial court remains uniquely situated to evaluate video evidence *in context*. For example, after hearing testimony explaining what a video depicts, the trial court is in a superior position to resolve disputes about perspective, timing, or events occurring beyond the scope of the video, to assess witness credibility and demeanor, and to integrate those findings with any other evidence presented. The

appellate court's role is to review whether the trial court's findings are reasonably supported by the record, not to reweigh the credibility or effect of visual evidence itself. Designating video recordings as a unique class of evidence, subject to de novo review, erases that distinction and vitiates appellate courts' deference to trial court fact-finding.

¶33 Appellate courts may, of course, view video evidence to determine whether a factual finding is clearly unsupported by the record—that authority already exists within *Adair*'s two-tier framework. For example, if a trial court found that a car was blue, but the video plainly shows it was red, the appellate court may correct that error without abandoning the deferential standard. However, when a video is open to differing interpretations or requires contextual testimony, appellate courts must defer to the trial court's findings if reasonably supported by the evidence. *See State v. Steinle*, 239 Ariz. 415, 418 ¶ 10 (2016) (recognizing that a "complete understanding of the total tenor and effect" of video evidence may depend on accompanying testimony (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171 (1988))).

¶34 Under *Adair*, appellate courts may reconcile any clear inconsistency between a trial court's factual findings and what the video evidence plainly depicts while continuing to review factual findings for

reasonable support in the record and legal conclusions de novo. Adhering to one unified standard promotes uniformity across evidentiary formats, reinforces the trial court's role as the primary factfinder, and prevents appellate reweighing of evidence under the guise of "independent" review. *See* Eric J. Magnuson & Samuel A. Thumma, *"Same as It Ever Was": Why Audio-Video Recordings in and of Trial Court Proceedings Should Not Change the Standard of Appellate Review*, 24 J. App. Prac. & Process 213, 233 (2024) ("The format of evidence being challenged on appeal should not alter the standard of appellate review. Audiovideo [sic] evidence should be treated the same way that appellate courts treat every other type of evidence, with the standard of review being clearly erroneous (for factual findings) or an abuse of discretion (for rulings on admissibility)."). Therefore, to the extent *Sweeney* suggests that appellate courts may engage in de novo or "independent" review of video evidence, we disapprove that standard and clarify that the *Adair* standard governs review of all suppression rulings, including those involving video evidence.

### III. CONCLUSION

¶35 Accordingly, we affirm the trial court's denial of Defendant's motion to suppress based on the traffic stop's reasonableness, vacate the

court of appeals' opinion, and remand to the court of appeals to address

Defendant's claim that Shewey unlawfully extended the traffic stop.