**STATE of Iowa, Appellee,**

v.

**Darryl Anthony McCOY, Appellant.**

No. 02–1665.

Supreme Court of Iowa.

Feb. 4, 2005.

Kent A. Simmons, Davenport, for appellant.

Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney General, William E. Davis, County Attorney, and Jerald Feuerbach and Michael Walton, Assistant County Attorneys, for appellee.

LAVORATO, Chief Justice.

The defendant, Darryl Anthony McCoy, appeals from his conviction and sentence for first-degree murder and willful injury. The decisive issue is whether McCoy established his claim that his trial counsel was ineffective in failing to move to suppress incriminating statements he made following his detention by the police. We ordered a limited remand to allow the district court to rule on the claim. *See* Iowa R.App. P. 6.12(7); *see also State v. Nelson,* 329 N.W.2d 643, 647 (Iowa 1983); *State v. Aldape,* 307 N.W.2d 32, 41 n. 3 (Iowa 1981).

Following a hearing, the district court found McCoy had established his claim of ineffective assistance of counsel on one of two grounds that he urged in support of his claim and granted him a new trial. On our de novo review, we find that McCoy established both grounds he urged in support of his claim, and we agree with the district court's decision on limited remand to grant him a new trial. We therefore reverse his conviction and sentence and remand for a new trial.

## I. Background Facts and Proceedings.

On Sunday night, January 27, 2002, Rick Wahlig and his girlfriend, Shelly Reyes, had been out to dinner. Sometime after eleven o'clock, the couple returned to Reyes's apartment complex at 2931 West 34th Street in Davenport. The couple noticed that a car was parked in a spot where Wahlig usually parked. On Wednesday, Wahlig noticed the car was still there. When he looked inside the car, Wahlig saw a bundle in the back seat covered with a blanket that appeared to be stained. Wahlig asked a neighbor to come out with him to inspect the car. On closer inspection, Wahlig noticed a foot. He then called the police.

William James Thomas, Jr., a detective with the City of Davenport police department, arrived on the scene with several other detectives, patrol officers, and evidence technicians. Thomas headed up the investigation. The car in question was a maroon 1980 Chevy Caprice with Iowa plates 529LDY. The vehicle was put on a flatbed truck and taken to the Davenport police station where it was photographed and processed for evidence. The body was taken from the car and photographed. A black garbage bag was around the decedent's head, and the bag was secured with tape.

The police traced the license plate on the vehicle to its owner and were able to determine that the last person driving the vehicle was Jonathan Johnson. The police contacted Jonathan's mother, who came to the station and identified the decedent's clothing.

Detective Thomas, together with several other officers and an evidence technician, were present at the autopsy that took place in Rockford, Illinois. Once the plastic bag was removed from the decedent's head, the decedent was positively identified as Jonathan Johnson. The autopsy disclosed that Jonathan had been shot three times, stabbed, cut, and experienced blunt force injury to the head.

On the way back to Davenport, Detective Thomas received a call on his cell phone from the Davenport police department to go directly to 2218 Emerald Drive, Apartment No. 1. Brandy Johnson (the decedent's sister) and Lawrence McCoy (Brandy's significant other and Darryl McCoy's brother) shared the apartment before Brandy's incarceration, which was unrelated to this case. Brandy consented to the search of the apartment.

The search revealed blood splattering on the tiled entryway floor, the bathroom

wall, a closet wall, and the living room. In addition, bloody fingerprints were found on two bottles of cleaning products.

Detective Thomas then requested that paperwork be filed to pick up Lawrence McCoy on a material witness charge so the police could interview him. Following the search and the request to pick up Lawrence McCoy, Detective Thomas drove to the Henry County Jail in Cambridge, Illinois to interview Brandy.

Following that interview, Detective Thomas applied for a search warrant for 514 Gaines Street to look for Lawrence McCoy. The police had learned that Lawrence McCoy was currently living at that address. After securing the search warrant, Detective Thomas, accompanied by two other detectives, drove in that direction. On the way, at approximately 1:00 a.m. on February 2, Detective Thomas saw a vehicle he knew Lawrence McCoy had been driving, so he stopped it. The detectives removed the occupants of the vehicle at gunpoint. The detectives determined that Darryl McCoy, rather than Lawrence McCoy, was driving the vehicle.

Before stopping the vehicle, the police were not looking for Darryl McCoy and thought they were stopping Lawrence McCoy. Upon identifying Darryl McCoy, the detectives placed him in the back seat of a police vehicle and brought him to the police station for an interview.

At the station, Detective Thomas conducted a videotaped interview of Darryl McCoy. At the start of the interview, McCoy read and signed a sheet waiving his *Miranda* rights. Eventually, he admitted being present while Lawrence McCoy and Chance Barnes killed Jonathan Johnson. Darryl McCoy also admitted that he helped clean the apartment and dispose of the body.

The State eventually charged Darryl McCoy, Lawrence McCoy, and Chance Barnes with (1) first-degree murder in violation of Iowa Code sections 707.1, 707.2, and 708.4 (2001) under the theories of premeditation and felony murder and (2) willful injury in violation of Iowa Code section 708.4(1).

The State tried Darryl McCoy separately, but the record does not reveal how the severance of the trial occurred. (Hereinafter we refer to Darryl McCoy as "the defendant.") At the jury trial, the State—without objection from defense counsel—offered into evidence the videotaped interview. The jury convicted the defendant of both charges. The court sentenced the defendant to a life sentence for the murder conviction and ten years for the willful injury conviction and then merged the willful injury sentence with the murder sentence.

The defendant appealed. After the case was submitted, we remanded the case to the district court for a hearing on the defendant's claim of ineffective assistance of trial counsel for failing to move to suppress statements the defendant made following his detention. The defendant based his claim of ineffective assistance of counsel on two grounds: (1) his detention was an illegal seizure; and (2) the nature of his detention and the officer's promise of leniency rendered his confession involuntary. The remand was pursuant to Iowa Rule of Appellate Procedure 6.12(7), which provides:

> The appropriate appellate court during appeal or pending application for appeal may remand the cause to the district court, which shall have jurisdiction for such specific proceedings as may be directed by the appellate court. Notwithstanding such remand, jurisdiction of the appeal shall remain in the appellate court which ordered the remand.

Following a hearing, the district court found against the defendant on the first ground (illegal seizure) but found for the defendant on the second ground (involuntary confession). The court granted the defendant a new trial.

The matter is again before us pursuant to Iowa Rule of Appellate Procedure 6.12(7).

## II. Issues.

The State agrees with the district court ruling on the illegal seizure issue but challenges its ruling on the involuntary confession issue. The defendant on the other hand agrees with the district court ruling on the involuntary confession issue but challenges its ruling on the illegal seizure issue.

## III. Scope of Review.

■■■ Because the defendant alleges ineffective assistance of counsel, we set out the following well-established principles of review in this area:

Ordinarily, we do not consider issues raised for the first time on appeal. The issues forming the basis of [the defendant's] claim of ineffective assistance of counsel fall into that category. However, we recognize an exception in the case of claims of ineffective assistance of counsel. We do so because as a practical matter these claims are not made by attorneys against their own actions. Because [the defendant's] claims of ineffective assistance of counsel arise from [his] Sixth Amendment right to counsel, our review is de novo. To prevail on these claims, [the defendant] must show that [his] trial counsel failed to perform an essential duty *and* that prejudice resulted from this failure. Failing to perform an essential duty means counsel's performance fell outside the normal range of competency.

*State v. Scalise,* 660 N.W.2d 58, 61–62 (Iowa 2003) (citations omitted). The normal range of competency includes being familiar with the current state of the law. *State v. Hopkins,* 576 N.W.2d 374, 379–80 (Iowa 1998).

■■■ Ordinarily, we do not decide claims of ineffective assistance of counsel on direct appeal, preferring to let the parties explore the matter in postconviction relief proceedings. *Id.* at 378. Our reason for not deciding such claims on direct appeal is because trial counsel has not had the opportunity to respond to the claim. *Id.* "However, we do consider such claims when the record is clear and plausible strategy and tactical considerations do not explain counsel's actions." *Id.*

Here, on limited remand, there was a hearing before the district court on the defendant's claim of ineffective assistance of counsel. The defendant's trial counsel testified concerning his reasons for not filing the motion to suppress. We therefore have a sufficient record to decide the defendant's claim of ineffective assistance of counsel.

## IV. Ineffective Assistance of Counsel for Failing to File Motion to Suppress Defendant's Statements—The Illegal Seizure Issue.

■■■ **A. Failure to perform an essential duty.** As to the first prong of his claim of ineffective assistance of counsel, the defendant contends his trial counsel failed to perform an essential duty when he failed to file a motion to suppress the defendant's incriminating statements to the police. In support of his contention, the defendant argues those statements were made as a result of an illegal seizure in violation of the Fourth and Fourteenth Amendments of the federal constitution

and article 1, section 8 of the Iowa Constitution and were for that reason inadmissible evidence.

■■■ **1. Illegal seizure.** The Fourth Amendment to the federal constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment is binding on the states through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961). Evidence obtained in violation of these provisions is inadmissible, regardless of its relevancy or probative value. *State v. Reinders*, 690 N.W.2d 78, 81 (Iowa 2004).

■■■ Because the search and seizure clause of the Iowa Constitution, *see* Iowa Constitution article 1, section 8, is substantially identical in language to the Fourth Amendment, the construction of the federal constitution is persuasive in our interpretation of the state provision. *Id.* However, decisions of the United States Supreme Court that interpret the Fourth Amendment are not binding on us with respect to the Iowa Constitution. *Id.* Because we find no basis to distinguish the protections afforded by the Iowa Constitution from those afforded by the federal constitution under the facts of this case, our discussion of the defendant's claimed seizure violation applies equally under both constitutional provisions. *See id.*

■■■ Warrantless searches and seizures are per se unreasonable unless a recognized exception applies. *State v. Eu-*

*banks*, 355 N.W.2d 57, 58 (Iowa 1984). The State must prove by a preponderance of the evidence the warrantless search or seizure was lawful. *State v. Bumpus*, 459 N.W.2d 619, 622 (Iowa 1990).

The State first contends that the defendant's trial counsel had no reason to believe that the defendant was illegally seized when the police transported him to the police station and therefore had no duty to file a motion to suppress his statements. The State's fallback position is that the defendant voluntarily went to the police station.

The facts here are similar to those in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), a case that presented the same issue that confronts us here. In *Dunaway*, a detective received a tip implicating the petitioner in an attempted robbery and homicide, but learned nothing that would supply enough information for an arrest warrant. Nevertheless, the detective ordered other detectives to pick up the petitioner and bring him in. The police then took the petitioner into custody. Although the police did not tell him he was under arrest, the petitioner would have been physically restrained if he had tried to leave. The police drove him to the police station and placed him in an interrogation room. After waiving his *Miranda* rights, the petitioner made statements and drew sketches that implicated him in the crime. In his state-court trial, the petitioner's motion to suppress was denied, and he was eventually convicted. *Dunaway*, 442 U.S. at 202–03, 99 S.Ct. at 2251–52, 60 L.Ed.2d at 829–30.

At issue was the legality of the custodial questioning on less than probable cause. *Id.* at 202, 99 S.Ct. at 2251, 60 L.Ed.2d at 829. The Court began its analysis by noting that before *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it

analyzed the Fourth Amendment's guarantee against unreasonable seizures of persons in terms of arrest, probable cause for arrest, and warrants based on such probable cause. *Id.* at 207–08, 99 S.Ct. at 2254, 60 L.Ed.2d at 832–33. According to the Court,

> [t]he term "arrest" was synonymous with those seizures governed by the Fourth Amendment. While warrants were not required in all circumstances, the requirement of probable cause, as elaborated in numerous precedents, was treated as absolute. The "long-prevailing standards" of probable cause embodied "the best compromise that has been found for accommodating [the] often opposing interests" in "safeguard[ing] citizens from rash and unreasonable interferences with privacy" and in "seek[ing] to give fair leeway for enforcing the law in the community's protection." The standard of probable cause thus represented the accumulated wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest "reasonable" under the Fourth Amendment. The standard applied to all arrests, without the need to "balance" the interests and circumstances involved in particular situations.

*Id.* at 208, 99 S.Ct. at 2254, 60 L.Ed.2d at 833 (citations omitted) (footnotes omitted) (second, third, and fourth alterations in original).

"Probable cause," the Court said,

> "exists where 'the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed [by the person to be arrested]."

*Id.* at 208 n. 9, 99 S.Ct. at 2254 n. 9, 60 L.Ed.2d at 833 n. 9 (citations omitted) (alterations in original).

Continuing with its analysis, the Court in *Dunaway* noted several important holdings in *Terry*. First, *Terry* "for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause." *Id.* at 208–09, 99 S.Ct. at 2254, 60 L.Ed.2d at 833.

Second, the factual scenario in *Terry*— "a brief, on-the-spot stop on the street and a frisk for weapons," did not "fit comfortably within the traditional concept of an 'arrest.'" *Id.* at 209, 99 S.Ct. at 2254, 60 L.Ed.2d at 833. Nevertheless, even this type of action constituted a "'serious intrusion,'" requiring therefore that such action "'be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.'" *Id.* at 209, 99 S.Ct. at 2254–55, 60 L.Ed.2d at 833 (citations omitted). But, because the intrusion in a "stop and frisk" was "so much less severe than that involved in traditional 'arrests,'" *Terry* "declined to stretch the concept of 'arrest'—and the general rule requiring probable cause to make arrests 'reasonable' under the Fourth Amendment—to cover such intrusions." *Id.* at 209, 99 S.Ct. at 2255, 60 L.Ed.2d at 833.

Third, rather than stretch the concept of arrest to cover a stop-and-frisk, *Terry*

> treated the stop-and-frisk intrusion as a *sui generis* "rubric of police conduct." And to determine the justification necessary to make this specially limited intrusion "reasonable" under the Fourth Amendment, the Court balanced the limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety. As a consequence, the Court established "a nar-

rowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."

*Id.* at 209, 99 S.Ct. at 2255, 60 L.Ed.2d at 833–34 (citations omitted).

Last, *Dunaway* summarized these holdings this way:

Thus, *Terry* departed from traditional Fourth Amendment analysis in two respects. First, it defined a special category of Fourth Amendment "seizures" so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment "seizures" reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons.

*Id.* at 209–10, 99 S.Ct. at 2255, 60 L.Ed.2d at 834.

Important to the case before us, *Dunaway* rejected the government's argument "to adopt a multifactor balancing test of 'reasonable police conduct under the circumstances' to cover all seizures that do not amount to technical arrests":

[T]he protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the "often competitive enterprise of ferreting out crime." A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront. Indeed, our recognition of these dangers, and our consequent reluctance to depart from the proved protections afforded by the general rule, are reflected in the narrow limitations emphasized in the cases employing the balancing test. For all but those narrowly defined intrusions, the requisite "balancing" has been performed in centuries of precedent and is embodied in the principle that seizures are "reasonable" only if supported by probable cause.

*Id.* at 213–14, 99 S.Ct. at 2257, 60 L.Ed.2d at 836–37 (citation omitted) (footnote omitted).

Also important to the case before us, *Dunaway*, relying on prior precedent, clearly rejected the argument that "investigative detentions" do not require probable cause:

"[T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.' "

*Id.* at 214–15, 99 S.Ct. at 2257–58, 60 L.Ed.2d at 837 (citation omitted) (alteration in original); *see also Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416, 428 (1975) (similarly disapproving arrests made for "investigatory" purposes on less than probable cause).

The Court in *Dunaway* concluded that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." 442 U.S. at 216, 99 S.Ct. at 2258, 60 L.Ed.2d at 838. As to the facts before it, the Court held that the police violated the Fourth and Fourteenth Amendments "when, without probable cause, they seized [the] petitioner and transported him to the police station for interrogation." *Id.* at 216, 99 S.Ct. at 2258, 60 L.Ed.2d at 838.

 Even when under *Terry* there is reasonable suspicion to stop an individual, the reasonableness requirement of the Fourth Amendment dictates that "[t]he scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229, 238 (1983). Moreover, an "investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop," and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500, 103 S.Ct. at 1325–26, 75 L.Ed.2d at 238. Finally, the State has the burden to "demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id.* at 500, 103 S.Ct. at 1326, 75 L.Ed.2d at 238.

On the same point, we said in *Kreps*:

The purpose of an investigatory stop is to allow a police officer to confirm or dispel suspicions of criminal activity through reasonable questioning. Such a stop and a subsequent detention—even though temporary and for a limited pur-

pose—is a "seizure" within the meaning of the Fourth Amendment. Because the stop is a seizure, it is subject to the "constitutional imperative that it not be 'unreasonable' under the circumstances."

650 N.W.2d at 641 (citations omitted).

 The facts here differ from those in *Dunaway* only in that here the police stopped a vehicle the defendant was driving whereas in *Dunaway* police picked up the defendant. So no vehicle stop was involved in *Dunaway*. As far as vehicles are concerned,

stop[ping] a car and temporarily detain[ing] an individual [renders] the temporary detention ... a "seizure" within the meaning of the Fourth Amendment. The detention is such a seizure even though the detention is only for a brief period of time and for a limited purpose. For this reason, "[a]n automobile stop is ... subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."

*State v. Heminover*, 619 N.W.2d 353, 357 (Iowa 2000) (citations omitted) (second ellipsis and fourth alteration in original), *overruled on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n. 2 (Iowa 2001).

This was the state of the law when trial counsel undertook representation of the defendant.

2. **Analysis.**

a. **The State's contention that trial counsel had no reason to believe that defendant was illegally seized.** As mentioned, the State first argues that the defendant's trial counsel had no reason to believe that the defendant was illegally seized when he was transported to the police station and for that reason had no duty to file a motion to suppress the defen-

dant's statements. For reasons that follow, we disagree.

Significantly, the minutes of testimony stated the following:

Detective Thomas will testify regarding his involvement in the arrest of Darryl McCoy on February 2, 2002. This witness and detectives Martin and Marxen stopped a Red Dodge Durango with Iowa plates 957JWM which they knew Lawrence McCoy had been driving. They identified the driver as Darryl McCoy and the passenger as Isom Rogers. These individuals were taken to the Davenport Police Dept. where Thomas interviewed Darryl McCoy.

Attached to the minutes is Detective Thomas's incident report dated February 2, 2002. In that report he wrote:

On 2/01/02 we developed enough information in the Jonathan Johnson homicide case to obtain a pick up on suspect Lawrence McCoy. The pick up was on a Material Witness charge. . . .

We also developed information that suspect Lawrence McCoy could be at 514 Gaines St. A search warrant was obtained for 514 Gaines St. to look for Lawrence McCoy. We also knew that Lawrence McCoy was driving a red 1998 Dodge Durango with Iowa plates 957JWM.

We left the station enroute to the address, I rode in a vehicle with Detectives K. Marxen and Martin. While in the area of 4th and Gaines we spotted the red Dodge Durango stopped at the red light waiting to continue south on Gaines. The vehicle was occupied by two M/Bs. Since we were so close to the Centennial Bridge we made a decision to pull our plain vehicle in front of the Durango, approach the subjects and id them.

The driver of the vehicle was ided as Darryl McCoy, Lawrence's brother.

The passenger was ided as Isom Rogers. McCoy and Rogers were transported to the station for interviews. The Durango was towed to the station and held until a search warrant could be obtained. A search was conducted at 514 Gaines, Lawrence McCoy was not in the residence.

The minutes of testimony and the incident report then state that Detective Thomas conducted a videotaped interview of the defendant at the police station in which the defendant made statements implicating him in the crime.

 The minutes of testimony and the incident report should have immediately alerted trial counsel, acting within the range of normal competency, to several things. The police were looking for Lawrence McCoy and had a pick up on him. Armed with this information, the police probably had reasonable suspicion to stop the vehicle the defendant was driving. When they did stop the vehicle, the detectives seized the defendant and the passenger within the meaning of the Fourth Amendment. The detectives could certainly ask enough questions to dispel any notion that Lawrence McCoy was in the vehicle. Once having learned the identity of the occupants, however, the reasonable scope of the intrusion ended. Any further detention would necessitate that the detectives had probable cause to arrest the defendant. At this point, there is no indication the police had any evidence implicating the defendant in the crime and therefore no probable cause to arrest him. Given these circumstances, an attorney acting within the range of normal competency would certainly consider filing a motion to suppress the incriminating statements. But there is more.

The defendant's original trial counsel (not the same counsel who tried the case)

deposed Detective Thomas before trial. The deposition is part of the limited remand record. In his deposition, Detective Thomas gave the following testimony about the stop:

Q. So you would not have had any conversation with him in any room other than the interview room that would be shown on the tape? A. No. The entire interview is on videotape, and it's in that one room.

Q. So he didn't say anything to you and you didn't say anything to him that would not be somewhere on that videotape. Would that be correct? A. Everything is on the videotape. The only part of the conversation we wouldn't have is what was said at the scene when we initially stopped them.

Q. Were you involved in the actual stop? A. Yes.

Q. What did he say, if anything, at the traffic stop? A. Nothing. I identified myself and told him he was coming to the station.

At this point, an attorney acting within the normal range of competency would think there was a *Dunaway* violation. This testimony suggests the police simply took the defendant to the station for investigative purposes, knowing full well they had no legal reason to detain him. There is nothing in this testimony to indicate the defendant voluntarily went to the station. Rather Detective Thomas *told* the defendant he was coming to the station.

Armed with these facts, an attorney acting within a normal range of competency would have filed a motion to suppress the defendant's statements at the police station, unless there was some strategic reason not to do so. At the limited remand hearing, the defendant's trial counsel testified he read the police reports, the minutes of testimony, and Detective Thomas's deposition. He also viewed the videotape.

He further testified that he conferred with the defendant's original trial counsel and both agreed there was nothing "suppressible." Counsel also admitted that it never occurred to him before trial to attack the defendant's incriminating statements at the station on the basis that the defendant was illegally detained for the interview. In hindsight, after having read *Dunaway*, counsel also admitted it may be applicable. Based on counsel's testimony, we can safely say he had no strategic or tactical reason not to file the motion. Rather, counsel's failure to file the motion was because he was simply unaware of any legal reason to suppress the statements.

At this point, the critical question is whether the motion to suppress would have been successful. The answer to that question turns on whether the State is correct in its fallback position that the defendant voluntarily went to the police station.

#### b. Voluntariness.

██ **(1) Consent.** All of the pre-trial information we have mentioned—the minutes of testimony, police reports, and Detective Thomas's deposition—indicates the defendant was *told* he was going to the police station. None of this information suggests that the defendant consented to go to the station. At the trial, Detective Thomas testified about the circumstances surrounding the stop. He testified that the defendant and the passenger were removed from the vehicle at gunpoint. Detective Thomas testified further that at the time of the stop the defendant was not even a suspect:

Q. Prior to your stopping Lawrence McCoy's vehicle, were you looking for Darryl McCoy? A. No. Darryl's name had not even come up in the investigation prior to the traffic stop. We

thought we were stopping Lawrence McCoy.

Q. So you weren't looking for Darryl McCoy at that time? A. No.

The State apparently concedes there was no probable cause to arrest the defendant at the time of the stop, but attempts to justify further detention beyond the police learning of the defendant's identity by arguing the defendant voluntarily went to the police station for the interview. On this point, at the trial, Detective Thomas testified as follows:

Q. And upon identifying him as Darryl McCoy, what did you do then? A. He was brought to the station, an interview was conducted with him.

Q. How was he brought to the station? A. Placed in the—I believe he was placed in the back seat of our vehicle and brought to the station.

Q. Did he agree to go to the station, or was he under arrest? A. Yes, he agreed. At that time, he was not under arrest.

Q. And when you arrived at the station, what did you do? A. Conducted an interview with him.

Q. Where was that interview conducted? A. In an interview room at the station.

Q. And again at that time was Mr. McCoy under arrest? A. No, he was not.

In contrast, the defendant testified at the trial that he did not want to go to the police station, that he was put in the police car, and that he was made to go.

At the limited remand hearing, Detective Thomas was asked about his deposition testimony in which he stated that the defendant did not say anything at the stop and that he—Detective Thomas—told the defendant he was going to the police station. The Detective stated that the depo-

sition testimony was a mistake and that his report, as well as the dispatcher's exhibit, indicates that he was transporting the defendant and Rogers as a "1059," which means passenger being driven to the station, as opposed to a "1095," which means arrest or in custody. The district court specifically found Detective Thomas credible "in his assertion that defendant agreed to go to the police station for an interview."

 On our de novo review, we give deference to the district court's findings, especially on credibility issues. However, we are not bound by those findings. *See Turner,* 630 N.W.2d at 606. Our de novo review convinces us that the State has not carried its burden to prove that the defendant consented to go to the police station. We are simply not persuaded that something as important as whether the defendant consented to go to the police station would be left out of Detective Thomas's police report, the minutes of testimony, and his deposition unless there simply was no such consent.

 (2) **Assumption that defendant consented.** Moreover, even if we accept Detective Thomas's testimony that the defendant consented to go to the police station, we nevertheless find on our de novo review that his consent was not voluntary. Our finding is likewise contrary to the district court's finding on this issue on limited remand.

The State's own evidence militates against a showing that the defendant made the trip voluntarily. For example, as mentioned, the minutes of testimony, Detective Thomas's incident report, and his deposition make no mention that the defendant accompanied the police to the station voluntarily. Rather the minutes of testimony indicate the defendant was taken to the station where he was interviewed. Detec-

tive Thomas's report states that the defendant was transported to the station. In his deposition, Detective Thomas stated the defendant said nothing at the stop and that he—Detective Thomas—told him he was coming to the police station. At the trial, Detective Thomas testified that the defendant was placed in the back seat of the police vehicle and brought to the station. That to us indicates force, not consent.

Moreover, there is no dispute that the defendant and the passenger were removed from the vehicle at gunpoint. At the trial, Detective Thomas simply stated that the defendant and Rogers were removed from the vehicle at gunpoint. At the limited remand hearing, Detective Thomas testified more fully about the circumstances of the stop:

Q. Okay. And was the individual—were the individuals in the vehicle removed? A. Yes.

Q. How was that done? A. I did not see how Detective Martin removed the passenger [Rogers] from the vehicle for obvious reasons. My view was blocked, but I went to the driver's door, opened the driver's door. Both Detective Marxen and I had our service revolvers pointed at the driver [the defendant]. We ordered him out of the vehicle and directed him to the ground.

. . . .

Q. Okay. Now, you order the driver out of the vehicle, and I believe you testified directed him to the ground? A. Yes.

Q. How was that done? A. I reached into the car, placed my left hand on what would have been his left arm, grabbed his arm, and directed him from the vehicle. Basically pulled him from the vehicle, directed him to the ground. At the time, I was yelling for him to get onto the ground.

Detective Thomas further testified that after identifying himself as a police officer, he asked the defendant if he would come to the station for an interview and the defendant agreed.

Except for Detective Thomas's testimony that the defendant agreed to go to the police station, all of these facts are consistent with the defendant's testimony that he did not want to go to the police station, that he was put in the police car, and that the police made him go to the station. In short, given all these circumstances, we find that " 'a reasonable person would have believed that he was not free to leave.' " *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565, 572 (1988) (citation omitted) (test for determining seizure under Fourth Amendment); *see also State v. Gully*, 346 N.W.2d 514, 517 (Iowa 1984) ("For a seizure there must be something uttered or done which would amount to an objective indication that the officer exercised some dominion over the person seized.").

Moreover, as in *Dunaway*, the defendant here was not told he was free to go and, given the circumstances, would probably have been physically restrained had he refused to accompany the police to the station. On this point, Detective Thomas conceded that he wanted to interview the defendant because he was driving Lawrence's vehicle, was Lawrence's brother, might have knowledge of Lawrence's whereabouts, and might have knowledge of the events leading up to Jonathan Johnson's death. This to us is the classic example of detention for investigatory purposes and an " 'expedition for evidence in the hope that something might turn up,' " a procedure condemned in *Dunaway*, 442 U.S. at 216, 99 S.Ct. at 2258, 60 L.Ed.2d at 838 (citation omitted).

The State contends that even if we were to give credence to the defendant's assertion that he did not voluntarily go to the police station, we need not find that trial counsel breached an essential duty. In support of this contention, the State asserts that the defendant never mentioned to his trial counsel that he was forced to go to the police station. At the hearing on limited remand, trial counsel testified that he did not recall the defendant saying anything to him that he did not go to the police station voluntarily. On the other hand, there is no suggestion that counsel even questioned the defendant about the circumstances surrounding the stop. Suffice it to say that trial counsel had ample reason to suspect an illegal stop and should have questioned the defendant about the circumstances. It is not surprising that counsel did not make such an inquiry given his admission he was unaware of the legal ramifications surrounding the stop.

As mentioned, the State had the burden to prove that the defendant went to the station voluntarily. All of the facts we have mentioned fall far short of establishing the defendant's voluntariness. Moreover, all of these facts were reasonably discoverable had counsel acted within the normal range of competency. The inescapable conclusion is that trial counsel had no plausible, tactical, or legitimate reason to refrain from filing a motion to suppress. This becomes more apparent in our discussion on the prejudice prong where we discuss how crucial the defendant's incriminating statements were to the State's case.

On our de novo review of this record, we find that the police illegally seized the defendant in violation of his Fourth and Fourteenth Amendment rights under the federal constitution and article 1, section 8 of the Iowa Constitution.

**c. Causal connection between illegal detention and incriminating statements.** The exclusionary rule bars the use of both the evidence directly seized in an unlawful detention and evidence discovered indirectly through the use of evidence or information gained in the unlawful detention. *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453 (1963). Evidence obtained as a result of such a detention must be suppressed unless intervening events break the causal connection between the unlawful detention and the discovery of such evidence. *Id.* at 485, 83 S.Ct. at 416, 9 L.Ed.2d at 453–54; *see also Taylor v. Alabama,* 457 U.S. 687, 689–90, 102 S.Ct. 2664, 2666–67, 73 L.Ed.2d 314, 319 (1982); *Dunaway,* 442 U.S. at 218–19, 99 S.Ct. at 2259–60, 60 L.Ed.2d at 839–40; *Brown,* 422 U.S. at 599, 95 S.Ct. at 2259, 45 L.Ed.2d at 424; *State v. Hatter,* 342 N.W.2d 851, 856 (Iowa 1983). The test is whether the incriminating evidence was obtained by exploitation of the illegal detention rather than by means sufficiently distinguishable to purge the evidence of the primary taint. *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455; *accord Dunaway,* 442 U.S. at 217, 99 S.Ct. at 2259, 60 L.Ed.2d at 839; *Brown,* 422 U.S. at 599, 95 S.Ct. at 2259, 45 L.Ed.2d at 424; *Hatter,* 342 N.W.2d at 856.

*Brown* made clear that the exclusionary rule, when used to make effective the Fourth Amendment, serves interests and policies that are different from those that the exclusionary rule serves under the Fifth Amendment. 422 U.S. at 601, 95 S.Ct. at 2260, 45 L.Ed.2d at 425–26. Accordingly, *Miranda* warnings by themselves do not purge the taint of an illegal detention:

> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of

how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words."

*Id.* at 602–03, 95 S.Ct. at 2261, 45 L.Ed.2d at 426 (citation omitted) (footnote omitted); *accord Dunaway*, 442 U.S. at 217, 99 S.Ct. at 2259, 60 L.Ed.2d at 839; *Hatter*, 342 N.W.2d at 856. For this reason, "although a confession after proper *Miranda* warnings may be found 'voluntary' for purposes of the Fifth Amendment, this type of 'voluntariness' is merely a 'threshold requirement' for Fourth Amendment analysis." *Dunaway*, 442 U.S. at 217, 99 S.Ct. at 2259, 60 L.Ed.2d at 839 (footnote omitted) (citing *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262, 45 L.Ed.2d at 427). Thus, as *Dunaway* notes, "[b]eyond this threshold requirement, *Brown* articulated" the exploitation test, which is "designed to vindicate the 'distinct policies and interests of the Fourth Amendment.'" *Dunaway*, 442 U.S. at 217, 99 S.Ct. at 2259, 60 L.Ed.2d at 839 (quoting *Brown*, 422 U.S. at 602, 95 S.Ct. at 2261, 45 L.Ed.2d at 426).

*Brown* articulated several factors a court must consider in determining whether incriminating statements are obtained by exploitation of an illegal detention:

The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive....

The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.

*Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62, 45 L.Ed.2d at 427 (citations omitted) (footnotes omitted).

The facts in this case are remarkably similar on the issue to the facts in *Brown, Dunaway*, and *Taylor*. In *Brown*, the defendant made an incriminating statement after he was illegally arrested, taken to the police station, and given his *Miranda* warnings. Two hours separated Brown's statement from his illegal arrest. In *Dunaway*, the police unlawfully took the defendant into custody following which he made incriminating statements after being given his *Miranda* warnings. In *Taylor*, after the police illegally arrested the defendant, they took him to the police station where they gave him his *Miranda* warnings, placed him in a lineup, and told him that his fingerprints matched those on stolen goods. Thereafter he confessed. A short visit by his girlfriend and six hours separated the defendant's confession from his illegal arrest. In all three cases, the Court held that the incriminating statements had to be suppressed because no intervening events of any significance existed.

In *Hatter*, this court relied on the factual similarity between these three cases and the case before it in concluding that the defendant's incriminating statements and

other evidence obtained after the defendant was illegally arrested had to be suppressed. The court found that the defendant was taken to the police station after he was arrested, given his *Miranda* warnings, and questioned for over four hours after which he gave the incriminating statements. In reaching its conclusion, the court noted that the "temporal proximity between the [illegal] arrest and defendant's confession as to the alleged crime ... was relatively short" and that "[t]he record also fail[ed] to show a single intervening event of significance" between the arrest and the confession. *Hatter,* 342 N.W.2d at 857.

■ Here, the defendant was seized without probable cause, taken to the police station against his will, given his *Miranda* warnings, and then questioned for more than two hours during which he made incriminating statements. In the words of *Brown,* the illegal detention here was "both in design and in execution ... investigatory." 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428. Moreover, the temporal proximity between the illegal detention and the incriminating statements was relatively short—approximately two hours—with no single intervening event of significance between such detention and incriminating statements.

On our de novo review, we find that the State has failed to sustain its burden to show the incriminating statements were not obtained by exploitation of an illegal detention. In short, the State has failed to sustain its burden that such statements were admissible. Because the incriminating statements were inadmissible, the defendant's trial counsel failed to perform an essential duty when he failed to file a motion to suppress those statements.

That brings us to the issue of prejudice, the second prong of the defendant's claim of ineffective assistance of counsel.

■ **B. Prejudice.** To establish prejudice, a defendant must show that " 'there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different.' " *Hopkins,* 576 N.W.2d at 378 (citation omitted). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome' " of the case. *State v. Bugely,* 562 N.W.2d 173, 178 (Iowa 1997) (citation omitted).

■ The crux of the State's case was that the defendant aided and abetted his brother Lawrence and Chance Barnes in the murder of Jonathan Johnson. The State's whole case under this theory hinged on the defendant's incriminating statements. In its ruling on the defendant's motion for judgment of acquittal, the district court underscored just how important the aiding and abetting theory and the defendant's incriminating statements supporting this theory were in its decision to submit the case to the jury on the charge of first-degree murder:

> The Court has reviewed the case law in part concerning the issue of aiding and abetting. It's true that there is no direct testimony or circumstantial evidence that indicates any direct participation in the event by Darryl McCoy.

> However, the evidence does show that Mr. McCoy, through the testimony of Mr. Wilson, was at the scene prior to the incident. Through Mr. McCoy's own statements, he was near the event when it occurred, that being his description of the gunshots that were fired, and the case law indicates that although knowledge or proximity to the scene, standing alone, is not enough to prove aiding and abetting ... the State must prove or show the defendant assented to or lent countenance or approval to a criminal act by either active participation in it or

by some manner encouraging it prior to or at the time of its commission. Again, there is no direct evidence that he encouraged it prior to the incident or acted in a manner to participate at the time of its commission.

However, the circumstantial evidence that the jury may rely on in coming to its conclusion that Mr. McCoy—Mr. Darryl McCoy may have participated in the act can be indicated by the fact that he did participate in the removal of the body and the covering of the body after the incident. The jury may infer from these acts that Mr. McCoy—Mr. Darryl McCoy may have participated in the act because of his activity after the event.

The [Court is] of the opinion that these facts, coupled with the fact that he was in the proximity of the incident, is sufficient to submit . . . these charges to the jury. . . .

Apart from the defendant's incriminating statements, the only evidence the State had against him was the fact that he was present at the scene. This fact was substantiated by Jerome Wilson who went to the Emerald Drive apartment with Jonathan Johnson on the night of the murder. Wilson gave the following testimony. Three people were in the apartment, when the pair entered. One was an individual he later learned was Lawrence McCoy, another was an individual he later learned was the defendant, and the third he did not know. Lawrence answered the door and asked Jonathan why he had broken into Lawrence's house. Jonathan replied he did not know anything about it whereupon Lawrence told Wilson to leave. Wilson left and shortly thereafter heard loud noises coming from the apartment. The third person, whom Wilson did not know, came out, and Wilson asked him where

Jonathan was. The individual replied "not to worry about it and don't go in there."

On cross-examination, Wilson testified that while he was in the apartment, he had seen the defendant walk back to the bathroom two times. Both times the defendant was in the bathroom just a short time. Wilson further testified that it did not appear to him that the defendant was paying any attention to Jonathan and him or to what was going on. In addition, Wilson testified that it did not appear to him that the defendant was involved at all in the disagreement between Lawrence and Jonathan and that he never saw Lawrence talk to the defendant in the apartment.

The defendant made the following incriminating statements to Detective Thomas. He—the defendant—was in the apartment when Jonathan was killed. The defendant witnessed a struggle between Lawrence, Chance, and Jonathan. Lawrence asked the defendant to hold Jonathan but he refused. The defendant then witnessed Chance shoot Jonathan in the stomach. Lawrence then took the gun and shot Jonathan in the head. Chance then shot Jonathan in the head. Lawrence stabbed Jonathan. The defendant then helped dispose of the body and clean up the apartment.

Clearly, the defendant's incriminating statements about helping with the disposal of the body and the cleanup of the apartment were crucial pieces of evidence. Absent this evidence together with Wilson's testimony that the defendant was not involved in the argument between Lawrence McCoy and Jonathan Johnson, the district court may well have granted the defendant's motion for judgment of acquittal on the first-degree murder charge. And even had the court submitted the charge to the jury, the jury may well have acquitted the defendant given the instruction on aiding

and abetting. For these reasons, we think there is a reasonable probability that but for trial counsel's failure to file the motion to suppress, the result of the trial would have been different.

We conclude the defendant has established both prongs of his claim of ineffective assistance of counsel on the illegal seizure issue.

## V. Ineffective Assistance of Counsel For Failing to File Motion to Suppress Defendant's Statements—The Involuntary Confession Issue.

■ **A. Breach of essential duty.** The defendant also contends his trial counsel was ineffective for failing to move to suppress his statements to the police because Detective Thomas's promises of leniency rendered his confession involuntary.

The defendant's trial counsel testified at the remand hearing that after viewing the videotape it never occurred to him that he could move to suppress the defendant's statements on the basis that the statements were involuntary. He testified further that he could think of no grounds for filing a motion to suppress the statements. There was therefore no strategic or tactical reason for not filing the motion.

The question then becomes whether Detective Thomas in fact made promises of leniency. Of course, the best evidence on that question is the videotape itself.

■ The State contends that Detective Thomas made no direct promises of leniency. Alternatively, the State suggests that if we find that the statements Detective Thomas made do qualify as promises of leniency, we should analyze the claim of promissory leniency applying the federal totality-of-the-circumstances test under the due process clause of the federal constitution rather than applying a per se

exclusionary rule. Under the federal totality-of-the-circumstances test, the courts look at "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973). The federal courts assess the following factors:

the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

*Id.* (citations omitted).

**1. Applicable Iowa law.** In *State v. Mullin*, this court held involuntary a written confession induced by an officer's statement to the defendant that it would be best for the defendant to tell what he knew about a robbery because more mercy would be granted by the authorities that handled the prosecution. 249 Iowa 10, 18, 85 N.W.2d 598, 602–03 (1957). This court held that "if it clearly appears the confession was induced by force, threats, promises, or other improper inducements, the question is one of law for the court alone and the statement should be rejected." *Id.* at 14, 85 N.W.2d at 600.

This court made clear in *Mullin* that a confession can never be received in evidence where the prisoner has been influenced by any threat or promise, " 'for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner' ", and therefore excludes the declaration if *any degree* of influence by force *or other inducement has admittedly been exerted* upon him. "Voluntary" [is] defined as meaning a statement made of the free will and accord of the accused, without coercion, whether from fear of any

threat of harm, promise or inducement, or any hope of reward.

*Id.* at 14, 85 N.W.2d at 600. Thus, it is clear that this court decided the admissibility issue not on a constitutional basis but on an evidentiary basis.

In *State v. Quintero*, we followed *Mullin*:

The present case lends itself to resolution without resorting to constitutional principles. A coerced confession should not be admitted in evidence because of its inherent lack of reliability. Our cases have long reversed criminal convictions for admitting involuntary confessions. The rule was developed, not as a constitutional principle, but because the law has no way of measuring the improper influence or determining its effect on the mind of the accused....

We hold that Quintero's involuntary confession was inadmissible, not on the basis of a constitutional principle, but as a matter of the law of evidence. Its probative value, if any exists, is substantially outweighed by the danger of confusion of issues and would be misleading to the jury under Iowa rule of evidence 403.

480 N.W.2d 50, 52 (Iowa 1992).

■ An officer can tell a suspect that it is better to tell the truth without crossing the line between admissible and inadmissible statements from the defendant. *State v. Hodges,* 326 N.W.2d 345, 349 (Iowa 1982). However, the line is crossed "if the officer also tells the suspect what advantage is to be gained or is likely from making a confession." *Id.* Under the latter circumstances, the officer's statements ordinarily become promises of leniency, rendering the statements involuntary. *Id.*

■ **2. Analysis.** The district court did not decide the voluntariness issue under a totality-of-the-circumstances test. It is clear from the court's ruling that it decided the issue on an evidentiary basis, a procedure with which we concur. This is evident from the court's failure to employ the usual factors federal courts resort to under that test. Moreover, we note the State filed no post-hearing motion asking the court to employ the federal totality-of-the-circumstances test.

After describing in detail what the videotape revealed, the district court made these findings:

After approximately twenty-two times of telling the defendant that if he didn't pull the trigger, he wouldn't be in any trouble, Detective Thomas told the defendant that he could not help him out unless he told him the truth. After approximately twenty-five times of telling the defendant that if he didn't pull the trigger he would not be in any trouble, the defendant told Detective Thomas that he went over to the apartment after [Jonathan Johnson's death] to help his brother and a person by the name of Chance remove the body....

The detective then left the room for a period of time and returned and for the twenty-sixth time told the defendant that if he didn't pull the trigger he would not be in any trouble. It was at that point that the defendant finally told the detective that he was in the restroom of the apartment when he heard [gunshots] and came out to see the victim, his brother and Chance in an altercation. He then saw Chance and his brother shoot the victim through a pillow and saw his brother stab the victim twice until the knife handle broke.

....

The court finds that Detective Thomas's statement during defendant's interview: "If you didn't pull the trigger, you won't be in any trouble," repeated at least twenty-five times, indicates lenien-

cy in exchange for defendant's confession. Moreover, Detective Thomas's statement suggested that it would be advantageous for defendant if he offered a confession or made inculpatory statements. The implication of Detective Thomas's repeated statement was, if the defendant didn't shoot Jonathan Johnson, he would not be in any trouble and he would [be] free to go or at least not be charged with Johnson's murder. It is questionable whether or not the aforementioned statement by Detective Thomas if mentioned once or twice to the defendant would have resulted in the Court's conclusion that the statement was a promise of leniency. However, once the Court reviewed the video it is apparent that this statement repeated twenty-six times in an hour and a half could only lead one to believe that a statement given would not result in charges being filed against the defendant.

Having viewed the videotape, we agree with and adopt these findings. We also agree and adopt the court's findings that the defendant's trial counsel was aware of what was on the videotape, should therefore have filed a motion to suppress the defendant's statements, and counsel's failure to do so constituted a breach of an essential duty.

█ **B. Prejudice.** The district court also found that the defendant was prejudiced by his counsel's failure to file the motion because of the lack of evidence implicating the defendant in the crime. Earlier, we found prejudice for the same reason on the illegal seizure issue. So we concur in the district court's finding of prejudice.

█ **C. Use of incriminating statements and prior trial testimony on retrial.** As mentioned, the defendant took the stand and repeated the incriminating statements. Ordinarily, a defendant's testimony at a former trial is admissible against the defendant in a later proceeding. *Harrison v. United States,* 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047, 1051 (1968). This is because "[a] defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives." *Id.* Moreover, the "waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him." *Id.* However, the same principle that prohibits the use of illegally obtained incriminating statements "prohibits the use of any testimony impelled thereby—the fruit of the poisonous tree, to invoke a time-worn metaphor." *Id.* The invocation of that principle turns on whether the defendant took the stand "to overcome the impact of [incriminating statements] illegally obtained and hence improperly introduced." *Id.* at 223, 88 S.Ct. at 2010, 20 L.Ed.2d at 1052. If that was the defendant's motivation in taking the stand, "then his testimony was tainted by the same illegality that rendered the [incriminating statements] themselves inadmissible." *Id.* The burden is on the State to show that the defendant's testimony was not in fact impelled by the prosecution's use of the defendant's illegally obtained incriminating statements. *Id.* at 225, 88 S.Ct. at 2011, 20 L.Ed.2d at 1053.

In its limited remand ruling, the district court found the incriminating statements that the defendant gave to Detective Thomas impelled the defendant to testify. And without that evidence, the defendant would have chosen not to testify.

█ In our de novo review, we likewise find that the incriminating statements im-

pelled the defendant to testify. In his trial testimony, the defendant insisted that his brother Lawrence had brought him to the Emerald Drive apartment against his wishes, and he had no advance knowledge of what his brother intended to do. The defendant further testified that he had no direct involvement in the killing, refused his brother's request for help to subdue the victim, and even tried to help him. When the defendant attempted to leave, Chance forcefully told him not to leave. Clearly, in our opinion, the defendant took the stand in an attempt to overcome and explain the incriminating statements he had made. We therefore conclude that the State has failed to show that the defendant's testimony was not impelled by the State's use of his illegally obtained incriminating statements.

*Harrison* makes clear that the State here may not use the defendant's prior trial testimony in its case-in-chief on retrial. What is not clear is whether the videotape and the defendant's prior trial testimony can be used for impeachment purposes if the defendant again testifies.

■■■ Ordinarily, the State may use illegally obtained evidence to impeach if the defendant testifies, "provided of course that the trustworthiness of the evidence satisfies legal standards." *Harris v. New York*, 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1, 4 (1971) (evidence obtained in violation of the strictures of *Miranda* are admissible for impeachment purposes); *accord Michigan v. Harvey*, 494 U.S. 344, 351, 110 S.Ct. 1176, 1181, 108 L.Ed.2d 293, 303 (1990) (incriminating statements obtained in violation of defendant's Sixth Amendment rights are admissible for impeachment purposes); *United States v. Havens*, 446 U.S. 620, 627–28, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559, 566 (1980) (evidence suppressed as the fruit of an unlawful search and seizure is admissible

for impeachment purposes); *State v. Hatter*, 414 N.W.2d 333, 339 (Iowa 1987) (incriminating statements obtained as a result of an unlawful arrest are admissible for impeachment purposes). In *Mincey v. Arizona*, however, the United States Supreme Court held that "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law." 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290, 303 (1978) (involuntary statements could not be used for impeachment purposes); *accord Harvey*, 494 U.S. at 351, 110 S.Ct. at 1181, 108 L.Ed.2d at 303 (incriminating statements obtained in violation of defendant's Sixth Amendment rights are not admissible if they are involuntary); *New Jersey v. Portash*, 440 U.S. 450, 459–60, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501, 510 (1979) (defendant's testimony before a grand jury under a grant of immunity could not constitutionally be used to impeach defendant; such testimony is compelled and for that reason violates the privilege against compelled self-incrimination provided by the Fifth and Fourteenth Amendments); *United States v. Walton*, 10 F.3d 1024, 1033 (3d Cir.1993) (defendant's statements to federal agents about illegal firearms trafficking were held to be coerced by agent's promises that his statements would not be used against him; because such statements were therefore involuntary in violation of defendant's Fifth Amendment right they could not be used to impeach defendant); *Hatter*, 414 N.W.2d at 338 (recognizing rule that involuntary incriminating statements are not admissible for impeachment purposes; however incriminating statements were found to be voluntary). Obviously, the reason involuntary incriminating statements cannot be used for any purpose in a criminal trial is because such statements are not reliable and therefore not trustworthy. *Nowlin v. State*, 346 So.2d 1020, 1023–24 (Fla.1977) (discussing requirement

in *Harris* that before illegally obtained evidence may be used to impeach, the trustworthiness of such evidence must satisfy legal standards; court held that "at the very least [this requirement] means that the statements must be voluntarily given").

 Although our decision that the defendant's incriminating statements were involuntary is based on an evidentiary rather than a constitutional analysis, we see no reason why the rule against use of involuntary statements for impeachment purposes should be different under our evidentiary analysis. Therefore, we hold that the State may not use the videotape either in its case-in-chief or for impeachment purposes on retrial because the defendant's statements in that videotape were involuntary.

 We likewise hold that under *Harrison* the State is foreclosed from using the defendant's prior trial testimony on retrial in its case in chief because that testimony was impelled by the use of the defendant's involuntary statements. The State is also foreclosed from using the defendant's prior trial testimony on retrial for impeachment purposes because the involuntary nature of the defendant's video statements taints his trial testimony: He was impelled to testify *because* of his involuntary statements. *See Hawthorne v. State*, 408 So.2d 801, 802–03 (Fla.Dist.Ct. App.1982) (trial testimony impelled by involuntary incriminating statements cannot be used on retrial for impeachment purposes), *appeal after remand*, 470 So.2d 770 (Fla.Dist.Ct.App.1985) (same).

## VI. Disposition.

We agree with the district court that the defendant has established his claim of ineffective assistance of counsel regarding the involuntary confession issue and therefore should be granted a new trial. However, we disagree with its decision regarding the illegal seizure issue and find that the defendant has established his claim of ineffective assistance of counsel on this issue as well. Accordingly, we reverse the judgment of conviction and sentence and remand the case for a new trial. We have carefully considered all of the other issues the parties have raised but find they have no merit.

**REVERSED AND CASE REMANDED FOR NEW TRIAL.**